SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
Alan R. Plutzik, Of Counsel (Bar No. 077785)
L. Timothy Fisher, Of Counsel (Bar No. 191626)
2125 Oak Grove Road, Suite 120
Walnut Creek, California 94589
Telephone: (925) 945-0770
Facsimile: (925) 945-8792
        -and-
Eric L. Zagar
Nichole Browning
J. Daniel Albert
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

ORIGINAL FILED

JUN 1 5 2007

RICHARD W. WIEKING
CLERK, U.S. DISTRICT COURT
NORTHERN DISTRICT OF CALIFORNIA
OAKLAND

E-filing

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

|  |  |
|---|---|
| JAMES FORSETH, Derivatively on Behalf of Nominal Defendant SONIC SOLUTIONS, <br><br> Plaintiff, <br><br> v. <br><br> ROBERT J. DORIS, MARY C. SAUER, JAMES A. MOORER, MICHAEL C. CHILD, ROBERT M. GREBER, PETER J. MARGUGLIO, R. WARREN LANGLEY, A. CLAY LEIGHTON, KIRK PAULSEN, MICHAEL J. COSTELLO and CHRISTOPHER A. KRYZAN, <br><br> and <br><br> SONIC SOLUTIONS, <br><br> Nominal Defendant. | Case No. **C07-03178** **JL** <br><br> **SHAREHOLDER DERIVATIVE COMPLAINT** <br><br> **ADR** <br><br> **JURY TRIAL DEMANDED** |

GO 44 SEC. N
NOTICE OF ASSIGNMENT
TO MAGISTRATE JUDGE SENT

Plaintiff James Forseth, by the undersigned attorneys, submits this Shareholder

Derivative Complaint (the "Complaint") against the defendants named herein.

## NATURE AND SUMMARY OF THE ACTION

1.     This is a shareholder's derivative action brought for the benefit of nominal defendant Sonic Solutions ("Sonic" or the "Company") against certain current and former members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

2.     This action arises from the Individual Defendants'(as defined herein) repeated and egregious breach of their fiduciary duties to the Company and its shareholders by approving and/or acquiescing in the issuance of Sonic stock options to Company executives, employees and directors that were unlawfully "backdated" to provide the recipients with windfall compensation at the direct expense of the Company.

3.     A stock option is the right to purchase a stock for a specified period of time at a fixed price, called the "exercise price" or "strike price." The exercise price is generally fixed to the market price of the stock on the date of grant. If the stock's market price exceeds the exercise price, the stock option holder may exercise the option, by purchasing the stock from the Company at the exercise price and reselling it at the higher market price, profiting from the difference.

4.     When the grant date of a stock option is manipulated to an earlier date on which the stock closed at a lower price – *i.e.*, when the stock option is "backdated" – the grantee pays less for the stock and the corporation, the counterparty to the stock option grant, receives less when the stock option is exercised. When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purposes behind the Company's stock option plans – to align the interests of shareholders, executives and employees – is undermined to the detriment of the Company and its shareholders, because the stock options are already "in the money"[1] when granted. Backdating stock option grants, therefore, represents a direct and

---

[1] "In the money" refers to when the exercise price of a stock option is below the market price of the underlying stock. *See* infra.

1  continuing waste of valuable corporate assets.

2      5.      To achieve the Company's stated goal of aligning the interests of shareholders,

3  executives and employees, the Company's shareholder-approved stock option plans provide that

4  the exercise price of a stock option "shall in no event be less than the Fair Market Value of the

5  Common Stock subject to the Option on the date of grant." However, the Individual Defendants

6  blatantly violated this and other provisions of the Company's stock option plans by backdating

7  stock options in order to illegally maximize the grantees' profits.  As such, and as detailed

8  below, the Individual Defendants' acts were *ultra vires* – unauthorized and beyond the scope of

9  power granted to them.

10      6.      For at least nine years, Sonic's directors, along with its top executive officers,

11  engaged in a secret scheme to grant undisclosed, "in the money" stock options to themselves and

12  others by backdating stock option grants to coincide with low closing stock prices.  In fact, in a

13  distinctive pattern from 1995 to 2003, the Individual Defendants backdated stock option grants.

14  Moreover, thirteen out of the Company's sixteen stock option grants (81%) from 1995 to 2003

15  were backdated, all of which were granted to top Sonic executives.[2]  The three stock option

16  grants that were not backdated were granted on the day of the Company's Annual Meeting of

17  Shareholders.

18      7.      Plaintiff has also conducted a statistical analysis identical in methodology to that

19  of the Merrill Lynch analysis that has been recently advocated by the Delaware Court of

20  Chancery and a number of federal district courts as indicative of a pattern of backdating.[3]  The

21  result of plaintiffs' statistical analysis indicates that over the period from 1995 through 2003 the

22  average annualized return for stock option grants to Sunrise executives based on a twenty day

23  trading window following the date of grant was 642%.  This is more than twenty times the

24

25  [2] The pattern excludes certain grants that were cancelled and re-priced pursuant to a Board authorized re-pricing plan instituted on March 3, 1998.

26  [3] The statistical analysis involved examining the twenty-day return of each individual stock option grant listed in the Company's proxy statement for each year of the relevant period. The twenty-day returns for all the grants made during each individual fiscal year were averaged and then annualized to represent what the twenty-day return would

27  correspond to for an entire year. The average annualized returns for each year during the relevant period were then averaged and compared to the average of an investor's annual return for each year over the relevant period.

28

average annualized investor return over the same period of 31%.

8.     By engaging in this scheme, the Individual Defendants were able to conceal that Sonic was not recording material compensation expenses and was materially overstating the Company's net income or materially understating its net loss from at least 1995 to 2003. By contrast, Sonic has suffered, and will continue to suffer, significant financial and non-monetary damages and injuries, several of which were identified in a report issued by the Center for Financial Research and Analysis on May 16, 2006, entitled *Options Backdating – Which Companies Are at Risk?*":

- **SEC investigation risk** – The SEC has begun information investigations at many companies in recent months and has also begun to call for improved disclosures around all areas of executive compensation.

- **Accounting restatement risk** – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

- **Tax/Cash implications** – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

- **Management credibility risk** – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholder, the reputation of management (and the related stock premium for superior management) could take a hit.

9.     The Individual Defendants' stock option grant backdating scheme not only surreptitiously and illegally lined the pockets of the recipients of backdated options and caused Sonic to issue materially false financial statements, but also undermined the key purpose of the Company's stock option-based executive compensation, *i.e.*, to align the interests of shareholders, executives and employees. By granting stock options such that they carried a strike price lower than the closing price of the stock on the date of grant, the recipients of backdated options profited immediately upon the award of the stock options without doing anything to improve the Company's business or financial condition.

10.     As alleged in detail herein, in gross breach of their fiduciary duties as officers

1    and/or directors of Sonic, the Individual Defendants colluded with one another to:

2          a.    improperly backdate grants of stock options to the Company's
                 executive officers and other employees, in violation of the
3                Company's shareholder approved stock option plans;

4          b.    improperly record and account for the backdated stock options, in
                 violation of Generally Accepted Accounting Principles ("GAAP");
5

6          c.    improperly take tax deductions based on the backdated stock
                 options, in violation of Section 162(m) of the Internal Revenue
                 Code, 26 U.S.C. § 162(m) ("Section 162(m)");  and
7

8          d.    produce and disseminate false financial statements and other false
                 Securities and Exchange Commission ("SEC") filings to Sonic's
9                shareholders and the market that improperly recorded and
                 accounted for the backdated stock option grants and concealed the
10               improper backdating of stock options.

11         11.    As a result of the Individual Defendants' egregious misconduct, all of which

12   emanated from California, Sonic has sustained significant damages and the recipients of the

13   backdated stock options have garnered unlawful proceeds.

14                              **JURISDICTION AND VENUE**

15         12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that

16   this Complaint states a federal question.  This Court has supplemental jurisdiction over the state

17   law claims asserted herein pursuant to 28 U.S.C. § 1367(a).  This action is not a collusive one to

18   confer jurisdiction on a court of the United States which it would not otherwise have.

19         13.    Venue is proper in this district because a substantial portion of the transactions

20   and wrongs complained of herein, including the defendants' primary participation in the

21   wrongful acts detailed herein, occurred in this district.  One or more of the defendants either

22   resides in or maintains executive offices in this district, and defendants have received substantial

23   compensation in this district by engaging in numerous activities and conducting business here,

24   which had an effect in this district.

25                                    **PARTIES**

26         14.    Plaintiff James Forseth is, and was at all relevant times, a shareholder of nominal

27   defendant Sonic.

28   _____

15.     Nominal defendant Sonic is a California corporation with its principal executive offices located at 101 Rowland Way, Suite 110, Novato, California 94945.  According to its public filings, Sonic develops and markets computer software related to digital media.

**Director Defendants**

16.     Defendant Robert J. Doris ("Doris") co-founded the Company in 1986 and has served as Chairman of the Board since September 2005.  Doris also served as the Company's Chief Executive Officer ("CEO") and Chairman of the Board from April 2005 to September 2005, and as Chairman of the Board, President and CEO from 1986 to April 2005.  Doris is married to defendant Mary C. Sauer.

17.     Defendant Mary C. Sauer ("Sauer") co-founded the Company in 1986 and has served as a director since 1986.  Sauer also served as a vice president of the Company from 1986 to September 2005, including as Senior Vice President of Marketing and Sales from February 1993 to September 2005.  Sauer is married to defendant Doris.

18.     Defendant James A. Moorer ("Moorer") served as a director and a vice president of the Company, including Senior Vice President of Audio Development from February 1993 to 2001.

19.     Defendant Michael C. Child ("Child") served as a director of the Company from August 1993 to September 1999 and as a member of the Audit Committee from at least 1995 to September 1999.

20.     Defendant Robert M. Greber ("Greber") has served as a director of the Company since August 1993 and as a member of the Audit Committee since at least 1995, including as Chairman since 2004.

21.     Defendant Peter J. Marguglio ("Marguglio") has served as a director of the Company since August 1986 and as a member of the Audit Committee since at least 1995.

22.     Defendant R. Warren Langley ("Langley") has served as a director of the Company and as a member of the Audit Committee since June 2001.

23.     Defendants Doris, Sauer. Moorer. Child, Greber, Marguglio and Langley shall be

1  collectively referred to herein as the "Director Defendants."

2      24.    During the relevant period, the Director Defendants approved the backdated stock

3  option grants at issue in this case. The Director Defendants also assisted in the preparation of

4  Sonic's annual and quarterly reports from 1995 through 2006 and reviewed, approved and helped

5  to prepare proxy statements that Sonic filed with the SEC from 1996 until 2003, which falsely

6  represented that Sonic stock options were granted at the fair market value of the Company's

7  common stock on the date of grant, in order to conceal the existence of and their participation in

8  the Individual Defendants' integrated and continuous scheme to backdate and to conceal the

9  backdating of stock option grants. The Director Defendants, with knowledge of the stock option

10  backdating scheme, signed Sonic's financial statements filed with the SEC from 1995 through

11  2006, which materially understated the Company's compensation expense and materially

12  overstated its net income or materially understated its net loss.

13                              **Option Recipient Defendants**

14      25.    Defendant A. Clay Leighton ("Leighton") has served as the Company's Executive

15  Vice President and Chief Financial Officer ("CFO") since September 2006. Leighton also

16  served as the Company's Senior Vice President of Worldwide Operations and Finance and CFO

17  from January 1999 to September 2006, and as Vice President of Finance from February 1993 to

18  January 1999.

19      26.    Defendant Kirk Paulsen ("Paulsen") served in various positions after he joined the

20  Company in August 1991, including Vice President of Sales from at least 1994 to 1996 and Vice

21  President for European Operations from 1996 to October 1999.

22      27.    Defendant Michael J. Costello ("Costello") served as the Company's Vice

23  President of Operations from at least 1995 to March 1996.

24      28.    Defendant Christoper A. Kryzan ("Kryzan") served as the Company's Senior

25  Vice President, Engineering and Marketing from January 1999 to May 2003, and as Vice

26  President of Marketing from March 1996 to January 1999.

27

28

1    29.    Collectively, Doris, Sauer, Leighton, Paulsen, Costello and Kryzan are referred to

2    herein as the "Option Recipient Defendants."

3    30.    Collectively, the Option Recipient Defendants and Director Defendants are

4    referred to herein as the "Individual Defendants."

5    31.    As executives and/or Board members, the Option Recipient Defendants approved

6    and/or received the backdated stock option grants at issue in this case.    Certain of these

7    Defendants assisted in the preparation of Sonic's annual and quarterly reports from 1995 through

8    2006 and reviewed, approved and/or helped to prepare proxy statements Sonic filed with the

9    SEC from 1996 through 2003, which falsely represented that Sonic stock options were granted at

10   the fair market value of the Company's common stock on the date of grant, in order to conceal

11   the existence of and their participation in the Individual Defendants' integrated and continuous

12   scheme to backdate and to conceal the backdating of stock option grants.    As a result of the

13   foregoing, the Option Recipient Defendants personally and financially benefited from the

14   backdated stock option grants particularized herein.

15   **DUTIES OF THE INDIVIDUAL DEFENDANTS**

16   32.    By reason of their positions as officers and/or directors of the Company and

17   because of their ability to control the business and corporate affairs of the Company, the

18   Individual Defendants owed the Company and its shareholders the fiduciary obligations of good

19   faith, trust, loyalty and due care, and were and are required to use their utmost ability to control

20   and manage the Company in a fair, just, honest and equitable manner.    The Individual

21   Defendants were and are required to act in furtherance of the best interests of the Company and

22   its shareholders so as to benefit all shareholders equally and not in furtherance of their personal

23   interest or benefit.    Each director and officer of the Company owes to the Company and its

24   shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

25   affairs of the Company and in the use and preservation of its property and assets, and the highest

26   obligations of fair dealing.

27   33.    The Individual Defendants, because of their positions of control and authority as

28

1  directors and/or officers of the Company, were able to and did, directly and/or indirectly,

2  exercise control over the wrongful acts complained of herein.

3      34.    To discharge their duties, the Individual Defendants, as the officers and directors

4  of the Company, were required to exercise reasonable and prudent supervision over the

5  management, policies, practices and controls of the Company.  By virtue of such duties, the

6  Individual Defendants were required to, among other things:

7
            a.    exercise good faith in ensuring that the affairs of the Company
8                 were conducted in an efficient, businesslike manner so as to
                  make it possible to provide the highest quality performance of
9                 its business;

10           b.    exercise good faith in ensuring that the Company was operated
                   in a diligent, honest and prudent manner and complied with all
11                 applicable federal and state laws, rules, regulations and
                   requirements, including acting only within the scope of its legal
12                 authority;

13           c.    exercise good faith in supervising the preparation, filing and/or
                   dissemination of financial statements, press releases, audits,
14                 reports or other information required by law, and in examining
                   and evaluating any reports or examinations, audits or other
15                 financial information concerning the financial condition of the
                   Company;

16           d.    exercise good faith in ensuring  that the Company's financial
                   statements were prepared in accordance with GAAP; and
17

18           e.    refrain from unduly benefiting themselves and other Company
                   insiders at the expense of the Company.

19      35.    The Individual Defendants were responsible for maintaining and establishing

20  adequate internal accounting controls for the Company and to ensure that the Company's

21  financial statements were based on accurate financial information.  According to GAAP, to

22  accomplish the objectives of accurately recording, processing, summarizing and reporting

23  financial data, a corporation must establish an internal accounting control structure.  Among

24  other things, the Individual Defendants, particularly the members of the Audit Committee, were

25  required to:

26           (1)    make and keep books, records, and accounts, which, in
                    reasonable detail, accurately and fairly reflect the transactions
27                  and dispositions of the assets of the issuer; and

28

(2)   devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

      (a)   transactions are executed in accordance with management's general or specific authorization; and

      (b)   transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

36.   Sonic's Audit Committee Charter provides that the purposes of the Audit Committee are, among other things, to:

    a.   Monitor the integrity of the financial statements of Sonic;

    b.   Meet with management and the independent auditor to review and discuss the annual financial statements and the report of the independent auditor thereon and, to the extent the independent auditor or management brings any such matters to the attention of the audit committee, to discuss significant issues encountered in the course of the audit work, including restrictions on the scope of activities, access to required information or the adequacy of internal controls;

    c.   Meet quarterly with management and the independent auditor to review and discuss the quarterly financial statements; provided that this responsibility may be delegated to the chairman of the audit committee;

    d.   Meet at least once each year in separate executive sessions with management and the independent auditor to discuss matters that the committee or either of these groups believes could significantly affect the financial statements and should be discussed privately;

    e.   Provide minutes of audit committee meetings to the board of directors on any significant matters arising from the committee's work; and

    f.   Prepare the report required by the rules of the Securities and Exchange Commission to be included in Sonic's annual proxy statement.

37.   Notably, throughout the relevant period, each Report of the Board Regarding Executive Compensation in the Company's proxy statements filed with the SEC stated:

The Board does not have a Compensation Committee. Accordingly, *it is the responsibility of the entire Board* to determine the most effective total executive compensation strategy, *based upon Sonic's business needs and consistent with the shareholders' interests, to administer Sonic's executive compensation plans, programs and policies*, to monitor corporate performance and its relationship to compensation of executive officers, and to take other appropriate actions concerning matters of

executive compensation.  (Emphasis added).

## FACTUAL ALLEGATIONS

### The Backdating of Stock Option Grants to the Option Recipient Defendants

38.    Pursuant to the terms of the Company's shareholder approved stock option plans, including the Sonic Solutions Stock Option Plan, the 1989 Stock Plan and the 1998 Stock Option Plan (collectively, the "Plans"), the exercise price of stock options "shall in no event be less than the Fair Market Value of the Common Stock subject to the Option on the date of grant," where "Fair Market Value" means "the closing sales price of the Common Stock reported on the Nasdaq National Market System or, if the Common Stock is not traded on the Nasdaq National Market, the fair market value of the Common Stock as determined by the Administrator in good faith."

39.    Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees," the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the stock options, the company must recognize the difference as an expense.

40.    Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals, (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

41.    From 1995 to 2003, the Board, according to the Company's proxy statements, had the responsibility "to determine the most effective total executive compensation strategy, based

1  upon Sonic's business needs and consistent with the shareholders' interests, to administer

2  Sonic's executive compensation plans, programs and policies, to monitor corporate performance

3  and its relationship to compensation of executive officers, and to take other appropriate actions

4  concerning matters of executive compensation."

5      42.    The Board knowingly and deliberately violated the terms of the Company's

6  shareholder approved stock option plans, APB 25 and Section 162(m) by knowingly and

7  deliberately backdating grants of stock options to make it appear as though the grants were made

8  on dates when the market price of Sonic stock was lower than the market price on the actual

9  grant dates, thereby benefiting the recipients of the backdated stock options.

10     43.    The entire Board had actual knowledge of the backdating and knew that it

11  violated the terms of the Company's shareholder approved stock option plans, APB 25 and

12  Section 162(m). All of the members of the Board knew that the publicly reported grant dates and

13  statements that the Company followed APB 25 and granted stock options with exercise prices

14  equal to the fair market value of Sonic's common stock on the date of grant were false because

15  the grants were, in fact, backdated.  The entire Board knowingly and deliberately approved the

16  scheme with knowledge of its consequences, *e.g.*, its effects on Sonic's financial statements.

17     44.    On November 21, 1995, the Individual Defendants purportedly granted 25,000

18  stock options to Leighton, the Company's Vice President of Finance.  The stock options were

19  granted following an enormous decline in Sonic's stock price, as detailed below:

20

21

22



23

24

25

26

27

28

1    45.    Less than one month later, on December 15, 1995, the Individual Defendants

2  purportedly granted 34,000 stock options to Paulsen and Costello, two of the Company's most

3  highly compensated executives.  The Company's stock price performance surrounding the grant

4  is shown below:



| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 12/15/95 | Paulsen | 20,000 | $6.50 |
| | Costello | 14,000 | $6.50 |

46.    On July 16, 1996, the Individual Defendants purportedly granted 20,000 stock

options to Leighton at an exercise price of $5.75, the lowest closing stock price of the first half of

Sonic's fiscal year and the second lowest closing stock price of the entire fiscal year, as

demonstrated below:

1

2

3

4

5

6

7

8

9



10   47.    On March 3, 1998, when Sonic's closing stock price was $2.6563, the Individual

11   Defendants purportedly re-priced 557,000 stock options to the Company's five most highly

12   compensated executives, at an exercise price of $2.5625, **which was below fair market value**.

13   The exercise price of the re-priced options coincided with the Company's closing stock price on

14   March 20, 1998, which was one of the lowest closing stock prices of the entire fiscal year, as

15   demonstrated below:

16

17

18

19   

20

21

22

23

24

25

26

| Purported Date of Re-Pricing | Recipient | Number of Stock Options Re-Priced | Exercise Price |
|---|---|---|---|
| 3/3/98 | Doris | 175,000 | $2.5625 |

27

28

| | Sauer | 112,000 | $2.5625 |
|---|---|---|---|
| | Moorer | 25,000 | $2.5625 |
| | Kryzan | 100,000 | $2.5625 |
| | Leighton | 145,000 | $2.5625 |

48.    On September 2, 1998, the Individual Defendants purportedly granted 190,000 stock options to Doris, Sauer, Kryzan and Leighton, four of the Company's top executive officers, at an exercise price of $1.688.    Interestingly, the Individual Defendants granted the stock options one day after the Company's Annual Meeting of Shareholders.    The Company's closing stock price on the day of the Annual Meeting of Shareholders was $1.75.    With the exception of this grant and the September 1999 grant, the Individual Defendants consistently granted September stock options on the day of Sonic's Annual Meeting of Shareholders.    Sonic's stock price performance surrounding the September 2, 1998 stock option grants is shown below:



9/2/98: SNIC stock options granted at $1.688

| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 9/2/98 | Doris | 85,000 | $1.688 |
| | Sauer | 40,000 | $1.688 |
| | Kryzan | 40,000 | $1.688 |
| | Leighton | 25,000 | $1.688 |

49.    On August 20, 1999, the Individual Defendants purportedly granted 50,000 stock options to Kryzan and Leighton, some of the Company's most highly compensated executives, at

an exercise price of $2.75, which followed a sharp decline in the Company's stock price, as
demonstrated below:



8/20/99: SNIC stock options granted at $2.75

| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 8/20/99 | Kryzan | 25,000 | $2.75 |
| | Leighton | 25,000 | $2.75 |

50.    On September 9, 1999, two days after the Company's Annual Meeting of
Shareholders, the Individual Defendants purportedly granted Doris, Sauer and Leighton 165,000
stock options at an exercise price of $2.656, Sonic's closing stock price on September 8, 1999, as
demonstrated below:



9/9/99: SNIC stock options purportedly granted using the 9/8/99 closing price

9/7/99: SNIC's Annual Shareholders Meeting

| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 9/9/99 | Doris | 85,000 | $2.656 |
| | Sauer | 40,000 | $2.656 |
| | Leighton | 40,000 | $2.656 |

51.    Purportedly, on April 1, 2000 and September 1, 2000, the Individual Defendants granted 48,000 stock options to Kryzan and 50,000 stock options to Leighton at an exercise price of $1.5630, equal to Sonic's closing stock price on November 30, 2000, as demonstrated below:



| Purported Date of Grant | Name | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 4/1/00 | Kryzan | 48,000 | $1.5630 |
| 9/1/00 | Leighton | 50,000 | $1.5630 |

52.    From July 2001 to December 2001, the Individual Defendants purportedly granted Doris, Sauer, Kryzan and Leighton 500,000 stock options while the Company's stock price performance was stagnant and immediately preceding a significant rise, as demonstrated below:



7/12/01, 10/25/01 & 12/3/01: SNIC stock options granted at $1.12, $1.61 and $1.35

| Purported Date of Grant | Name | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 7/12/01 | Doris | 90,000 | $1.12 |
| | Sauer | 90,000 | $1.12 |
| | Leighton | 40,000 | $1.12 |
| 10/25/01 | Leighton | 210,000 | $1.17 |
| 12/3/01 | Kryzan | 70,000 | $1.35 |

53.    Despite the flat performance of the Company's stock, the July 12, 2001 and December 3, 2001 stock options had exercise prices coinciding with the lowest closing prices of their respective months, as shown below:

a.    **Stock Price Performance Surrounding the July 12, 2001 Grant**





**b.  Stock Price Performance Surrounding the December 3, 2001 Grant**



54.    Each and every one of the aforementioned stock option grants was purportedly dated just after a significant decline, before a significant increase and/or at a particularly low closing price. The reason for the distinctive pattern set forth in the preceding paragraphs is that the purported grant dates set forth therein were not the actual dates on which the stock option grants were made. Indeed, thirteen out of sixteen discretionary grants from November 1995 to March 2003 fall squarely within this pattern. The three grants that do not fall within this pattern

1    were granted on the day of the Company's Annual Meeting of Shareholders, presumably

2    automatically.   The Board members knowingly and deliberately backdated the stock option

3    grants to make it appear as though the grants were made on dates when the market price of Sonic

4    stock was lower than the market price on the actual grant dates, thereby unduly benefiting the

5    Option Recipient Defendants who received backdated stock option grants.   This improper

6    scheme, which violated the terms of the Company's shareholder approved stock option plans,

7    resulted in stock option grants with lower exercise prices, which improperly increased the value

8    of the stock options and improperly reduced the amounts the Option Recipient Defendants had to

9    pay to the Company upon the exercise of the stock options.

10       55.      Defendants have continued to conceal their backdating scheme and keep the

11   Company's shareholders in the dark by failing to hold an annual shareholders meeting since

12   November 11, 2005. Pursuant to Cal. Corp. Code § 600(c), "[i]f there is a failure to hold the

13   annual meeting for a period of 60 days after the date designated therefor or, if no date has been

14   designated, for a period of 15 months after the organization of the corporation or after its last

15   annual meeting, the superior court of the proper county may summarily order a meeting to be

16   held upon the application of any shareholder after notice to the corporation giving it an

17   opportunity to be heard." Defendants' failure to hold an annual meeting for more than 19

18   months following the Company's last annual meeting of the shareholders is a violation of the

19   California Corporations Code.

20                      **The Sarbanes-Oxley Act of 2002 ("SOX")**

21       56.      Prior to the enactment of SOX, the Individual Defendants were able to engage in

22   the backdating of stock option grants with relative ease because under federal law they were only

23   required to report stock option grants to the SEC once a year.

24       57.      Twelve out of the fourteen pre-SOX stock option grants[4] disclosed in the

25   Company's proxy statements and Form 4s were dated to coincide with grant dates when the

26

27   _____

[4] The two grants on September 5, 2000 and September 4, 2001 that were not backdated were presumably granted

28   automatically on the day of the Company's Annual Meeting of Shareholders.

1  Company's stock was trading at a particularly low price, immediately following significant

2  declines and/or preceding significant increases in the Company's stock price, which is strongly

3  indicative of backdating.

4      58.    Pursuant to SOX, beginning on August 29, 2002, executives and directors were

5  required to report stock option grants to the SEC within two days of the grant. With this new

6  reporting requirement in place, the pervasive stock option backdating pattern seen previously

7  from 1995 to 2002 for the most part came to an end with one notable exception.

8      59.    According to the Company's July 29, 2003 proxy statement, the Individual

9  Defendants purportedly granted 100,000 stock options to Leighton on March 11, 2003 at an

10  exercise price of $3.97, the lowest closing stock price of the month. Notwithstanding SOX's

11  explicit two-day reporting requirement, Leighton did not report his March 11, 2003 stock option

12  grants as required. The stock price performance surrounding the March 11, 2003 grant is

13  detailed below:



22      60.    In a report released on October 20, 2006, the research firm of Glass, Lewis & Co.

23  conducted an extensive study surrounding the belief that late Form 4 filings can be one of the

24  signs of post-SOX stock option backdating (the "Glass Lewis Report"). Specifically, according

25  to the Glass Lewis Report, the research firm noted that "when we find late Form 4 filings where

26  the price of the underlying stock increased materially between the purported grant date and the

1  day the Form 4 was filed, we believe this raises legitimate questions about whether the grant was

2  backdated."

3  **Individual Defendants' Dissemination of False Financial Statements**

4      61.    The Individual Defendants prepared, approved and/or signed Sonic's annual and

5  quarterly SEC reports during the relevant period.  The Individual Defendants knowingly and

6  deliberately caused the Company to disseminate materially false and misleading statements in

7  the periodic filings that the Individual Defendants prepared, approved and/or signed.

8      62.    The Individual Defendants' stock option grant backdating scheme caused each of

9  Sonic's Forms 10-K and Forms 10-Q for the relevant period to materially understate Sonic's

10  compensation expense and materially overstate the Company's net income or materially

11  understate its net loss, because the Individual Defendants failed to expense the "in the money"

12  portion of Sonic's stock option grants during the period as required by APB 25.

13      63.    As a result of the improper backdating of stock option grants, the Company, with

14  the knowledge, approval and participation of the Individual Defendants,

15          a.    violated the terms of the Company's shareholder approved stock
16                option plans by granting stock options with exercise prices less
                 than the fair market value of the stock on the actual date of grant;

17          b.    violated GAAP by failing to recognize compensation expenses
18                incurred when the improperly backdated stock options were
                 granted;

19          c.    violated Section 162(m) by taking tax deductions based on stock
20                option grants that were not payable solely on account of the
                 attainment of one or more performance goals and violated the
21                terms of the Company's shareholder approved stock option plans;
                 and

22          d.    produced and disseminated to Sonic shareholders and the market
23                false financial statements that improperly recorded and accounted
                 for the backdated stock option grants, and thereby understated
24                compensation expenses and overstated net income or understated
                 net loss.

25      64.    Sonic's financial results for the fiscal years ended in 1996 through 2006 were

26  reported in Annual Reports on Form 10-K filed with the SEC.  Each Form 10-K was

27  simultaneously distributed to Sonic's shareholders and the investing public.  Defendants Doris,

28

Sauer, Moorer, Child, Greber, Marguglio, Langley and Leighton, with the knowledge that the financial statements were false and misleading, each signed at least one Form 10-K filed with the SEC between 1997 and 2006, as detailed below:

| Defendant Signatory | Forms 10-K for the Fiscal Years Ended In |
|---|---|
| Doris | 1996-2006 |
| Sauer | 1996-2006 |
| Moorer | 1996-1998 |
| Child | 1996-1999 |
| Greber | 1996-2006 |
| Marguglio | 1996-2006 |
| Langley | 2001-2006 |
| Leighton | 1996-2006 |

65.    Furthermore, in each of its Form 10-K Annual Reports filed with the SEC from 1996 to 2006, the Company, with the knowledge, approval and participation of each of the Individual Defendants, falsely represented that it followed APB 25 to account for stock-based compensation.

66.    As alleged previously, APB 25 required the Individual Defendants to record a compensation expense for stock options that were "in the money" on the date of grant. However, the Individual Defendants did not do so, thereby materially understating Sonic's compensation expense and materially overstating Sonic's net income or materially understating its net loss. These statements were designed to conceal, and did in fact conceal, the fact that the Individual Defendants were engaged in a continuous and systematic scheme of backdating stock option grants to Sonic insiders in violation of the law.

### False CEO and CFO Certifications

67.    In connection with the filing of certain Annual Reports on Form 10-K during the relevant period, Doris and Leighton filed false Certifications of Chief Executive Officer and Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906 of the Sarbanes-Oxley Act of 2002 (the "Certification").

1       68.    In each Certification, Doris and Leighton made certain representations with

2   respect to the accuracy and truthfulness of the information contained therein. For example, the

3   Company's Form 10-K for the fiscal year ended March 31, 2003, contained the following

4   Certifications made by Doris and Leighton:

I, Robert J. Doris/A. Clay Leighton, certify that:

> 1. I have reviewed this annual report on Form 10-K of Sonic Solutions;
>
> 2. Based on my knowledge, this annual report does not contain any untrue statement of a material fact or omit to state a material fact necessary to make the statements made, in light of the circumstances under which such statements were made, not misleading with respect to the period covered by this annual report;
>
> 3. Based on my knowledge, the financial statements, and other financial information included in this annual report, fairly present in all material respects the financial condition, results of operations and cash flows of the registrant as of, and for, the periods presented in this annual report;
>
> 4. The registrant's other certifying officers and I are responsible for establishing and maintaining disclosure controls and procedures (as defined in Exchange Act Rules 13a-14 and 15d-14) for the registrant and we have:
>
>> a) Designed such disclosure controls and procedures to ensure that material information relating to the registrant, including its consolidated subsidiaries, is made known to us by others within those entities, particularly during the period in which this annual report is being prepared;
>>
>> b) Evaluated the effectiveness of the registrant's disclosure controls and procedures as of a date within 90 days prior to the filing date of this annual report (the "Evaluation Date"); and
>>
>> c) Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;
>
> 5. The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):
>
>> a) All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report

1

        financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

2

3

    b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

4

5

6

7

    6.    The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

8

      \*        \*        \*        \*        \*        \*        \*

9

10

I, Robert J. Doris/A. Clay Leighton, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

11

12

    •    the Annual Report of Sonic Solutions on Form 10-K for the year ended March 31, 2005 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

13

14

    •    the information contained in such Annual Report fairly presents in all material respects the financial condition and results of operations of Sonic Solutions.

15

### The Individual Defendants' Concealment of Their Misconduct

16

17

18

19

20

21

    69.    The Individual Defendants caused Sonic to send shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period. The Individual Defendants prepared and/or reviewed each proxy statement filed with the SEC between 1996 and 2003. Moreover, they knew, or were deliberately reckless in not knowing, that the proxy statements were materially false and misleading.

22

23

24

25

26

    70.    Sonic's proxy statements that were sent to shareholders by the Individual Defendants annually in connection with annual shareholders' meeting typically concerned the election of directors, the approval and adoption of Sonic's stock option plan, the authorization to reserve shares for future issuance under the stock option plans, and the ratification of the selection of Sonic's auditor. Each proxy statement sent to shareholders during this period

27

28

1  contained materially false and misleading disclosures or omitted information about Sonic's stock

2  option practices, as alleged herein.

3      71.    From 1996 to 2003, the Company, with the knowledge, approval and participation

4  of the Individual Defendants, for the purpose and with the effect of concealing the improper

5  stock option grant backdating, disseminated to shareholders and filed with the SEC annual proxy

6  statements that falsely reported the dates of stock option grants to the Individual Defendants and

7  falsely stated that stock options were granted to the Individual Defendants with an exercise price

8  "equal to the fair market value of Sonic's common stock on the date of grant," as follows:

9
10
11        a.    Sonic's proxy statement filed with the SEC on July 29, 1996 falsely reported that stock options granted to Leighton were granted on November 21, 1995 and that stock options granted to Paulsen and Costello were granted on December 15, 1995;

12
13        b.    Sonic's proxy statement filed with the SEC on July 29, 1997 falsely reported that stock options granted to Leighton were granted on July 16, 1996;

14
15        c.    Sonic's proxy statement filed with the SEC on July 21, 1998 falsely reported that stock options re-priced to Doris, Sauer, Moorer, Kryzan and Leighton were re-priced on March 3, 1998;

16
17        d.    Sonic's proxy statement filed with the SEC on July 27, 1999 falsely reported that stock options granted to Doris, Sauer, Kryzan and Leighton were granted on September 2, 1998;

18
19        e.    Sonic's proxy statement filed with the SEC on July 31, 2000 falsely reported that stock options granted to Kryzan and Leighton were granted on August 20, 1999 and that stock options granted to Doris, Sauer and Leighton were granted on September 9, 1999;

20
21
22        f.    Sonic's proxy statement filed with the SEC on July 24, 2001 falsely reported that stock options granted to Kryzan were granted on April 1, 2000 and that stock options granted to Leighton were granted on September 1, 2000;

23
24
25        g.    Sonic's proxy statement filed with the SEC on July 25, 2002 falsely reported that stock options granted to Doris, Sauer and Leighton were granted on July 12, 2001, that stock options granted to Leighton were granted on October 25, 2001, and that stock options granted to Kryzan were granted on December 3, 2001; and

26
27        h.    Sonic's proxy statement filed with the SEC on July 29, 2003 falsely reported that stock options granted to Leighton were granted on March 11, 2003.

28

1    72.    Moreover, in the Reports of the Board Regarding Executive Compensation in the

2  Company's proxy statements filed between 1996 and 2003, Sonic falsely stated that its executive

3  compensation program was designed to "emphasize sustained performance by aligning rewards

4  with shareholder interests" and "motivate executives and employees to achieve Sonic's annual

5  and long-term business goals and encourage behavior toward the fulfillment of those objectives,"

6  when, in fact, the executives received instant profits regardless of whether the Company

7  achieved its objectives.

8                    **SONIC'S FALSE FINANCIAL REPORTING**

9                         **IN VIOLATION OF GAAP**

10    73.    As a result of the Individual Defendants' improper backdating of stock options,

11  the Individual Defendants caused Sonic to violate GAAP, SEC regulations and Internal Revenue

12  Service ("IRS") rules and regulations.

13    74.    Sonic's financial results for 1995 through 2003 were included in reports filed with

14  the SEC and in other shareholder reports. In these reports, the Individual Defendants represented

15  that Sonic's financial results were presented in a fair manner and in accordance with GAAP.

16    75.    The Individual Defendants' representations were false and misleading as to the

17  financial information reported, as such financial information was not prepared in conformity

18  with GAAP, nor was the financial information "a fair presentation" of the Company's financial

19  condition and operations, causing the financial results to be presented in violation of GAAP and

20  SEC rules.

21    76.    GAAP consists of those principles recognized by the accounting profession as the

22  conventions, rules and procedures necessary to define accepted accounting practice at the

23  particular time. Regulation S-X, to which the Company is subject as a registrant under the

24  Securities Exchange Act of 1934 ("Exchange Act"), 17 C.F.R. § 210.4-01(a)(1), provides that

25  financial statements filed with the SEC, which are not prepared in compliance with GAAP, are

26  presumed to be misleading and inaccurate.

27

28

1

### Violations of GAAP

2      77.    During the relevant period, the Individual Defendants caused the Company to

3  understate its compensation expense by not properly accounting for its stock options under

4  GAAP, thus overstating the Company's net income or understating the Company's net loss.

5      78.    Under well-settled accounting principles in effect throughout the relevant period,

6  Sonic did not need to record an expense for stock options granted to employees or directors at

7  the current market price ("at the money").  The Company was, however, required to record an

8  expense in its financial statements for any stock options granted below the current market price

9  ("in the money").  In order to provide Sonic executives and employees with far more lucrative

10 "in the money" stock options, while avoiding having to inform shareholders about millions of

11 dollars incurred by the Company in compensation expenses (and without paying the IRS millions

12 of dollars in employment taxes), the Individual Defendants systematically falsified Company

13 records to create the false appearance that stock options had been granted at the market price on

14 an earlier date.

15     79.    Throughout the relevant period, Sonic accounted for stock options using the

16 intrinsic method described in APB 25, employers were required to record as an expense on their

17 financial statements the "intrinsic value" of a fixed stock option on its "measurement date."  A

18 stock option that is "in the money" on the measurement date has intrinsic value, and the

19 difference between its exercise price and the quoted market price must be recorded as

20 compensation expense to be recognized over the vesting period of the option.  Stock options that

21 are "at the money" or "out of the money" on the measurement date need not be expensed.

22 Excluding non-employee directors, APB 25 required employers to record compensation

23 expenses on stock options granted to non-employees irrespective of whether they were "in the

24 money" or not on the date of grant.

25

### Sonic's GAAP Violations Were Material

26     80.    Sonic's false and misleading relevant period statements and omissions regarding

27 its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff

28

1   Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of

2   materiality. Among other items, SAB Topic 1M says: "A matter is 'material' if there is a

3   substantial likelihood that a reasonable person would consider it important." It also stresses that

4   materiality requires qualitative, as well as quantitative, considerations. For example, if a known

5   misstatement would cause a significant market reaction, that reaction should be taken into

6   account in determining the materiality of the misstatement.

7       81.    SAB Topic 1M further states:

8               among the considerations that may well render material a
9               quantitatively small misstatement of a financial statement item are --

10                          *        *        *
                 whether the misstatement masks a change in earnings or other
11              trends

12               whether the misstatement hides a failure to meet analysts'
                 consensus expectations for the enterprise

13                          *        *        *

14               whether the misstatement concerns a segment or other portion of
                 the registrant's business that has been identified as playing a significant
15              role in the registrant's operations or profitability.

16      82.    SAB Topic 1M also says that an intentional misstatement of even immaterial

17  items may be illegal and constitute fraudulent financial reporting.

18      83.    Sonic's misstatements satisfy these criteria and thus were material from both a

19  quantitative and qualitative perspective.

20  **Sonic's Financial Statements Violated Fundamental Concepts of GAAP**

21      84.    Due to these accounting improprieties, the Company presented its financial results

22  and statements in a manner that violated GAAP, which are described by the following

23  statements:

24          (a)  The principle that interim financial reporting should be based upon
25               the same accounting principles and practices used to prepare annual
                 financial statements (Accounting Principles Board Opinion No. 28,
26               ¶10);

27          (b)  The principle that financial reporting should provide information
                 that is useful to existing and potential investors and creditors and

28

other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it. To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

85.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials and their legal and financial advisors to be the type of information which is expected to be and must be disclosed.

### Sonic's Financial Statements Violated SEC Regulations

86.    During the relevant period, the Individual Defendants caused Sonic to violate SEC regulations by failing to disclose that the Company's senior executives had been granted backdated stock options.

1    87.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an

2  issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. § 229.303].

3  Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an

4  Option/SAR Grants table identifying the compensation of the named executive officers – the

5  Company's CEO and its next four most highly paid executives.    Item 402 requires particularized

6  disclosures involving a company's stock option grants in the last fiscal year.    In the summary

7  compensation table, the issuer must identify in a column "other annual compensation" received

8  by the named executives that is not properly categorized as salary or bonus, including any

9  "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred

10  compensation" paid to the officer during the period.    Item 402(b)(2)(iii)(C)(2).    In the option

11  grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the

12  options. . . . If such exercise or base price is less than the market price of the underlying security

13  on the date of grant, a separate, adjoining column shall be added showing market price on the

14  date of grant. . . ."    Item 402(c)(2)(iv).

15    88.    The Individual Defendants caused Sonic to violate SEC regulations by failing to

16  disclose that the Company's named executive officers had been granted stock options with

17  exercise prices below the market value on the date the Board approved the grant.

18    **Violations of IRS Rules and Regulations**

19    89.    During the relevant period, the Individual Defendants further caused Sonic to

20  violate IRS rules and regulations due to its improper accounting for the backdated stock options.

21  As a result, the Company's tax liabilities were understated, exposing Sonic to potential amounts

22  owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

23    90.    The Individual Defendants caused the Company to violate Section § 162(m),

24  which generally limits a publicly traded company's tax deductions for compensation paid to each

25  of its named executive officers to $1 million unless the pay is determined to be "performance-

26  based."    In order for compensation to be performance-based, the Compensation Committee or

27  Board must have set pre-established and objective performance goals.    The goals must then be

28

1    approved by the shareholders. Section 162(m) defines stock options as performance-based

2    provided they are issued at an exercise price that is no less than the fair market value of the stock

3    on the date of the grant. Accordingly, properly issued stock options do not have to be taken into

4    account in calculating whether an executive's compensation has exceeded the $1 million

5    compensation cap.

6        91.    Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie

7    top executives' soaring pay packages more closely to a company's performance. This change in

8    the tax law turned compensation practices for a company's top executives away from straight

9    salary-based compensation to performance-based compensation, including stock options.

10   According to former SEC Chairman Harvey L. Pitt: "What [162[m]] did was create incentives to

11   find other forms of compensation so people could get over the $1 million threshold without

12   running afoul of the code."

13       92.    The Individual Defendants caused Sonic to violate Section 162(m) by providing

14   backdated stock options to the Company's named executive officers, which were granted with

15   exercise prices that were less than the fair market value of the stock on the date of the grant. As

16   a result all of the income resulting from the exercise of the stock options must be included for

17   purposes of calculating whether the named executive's compensation exceeds the $1 million cap

18   for federal tax purposes.

19       93.    The Individual Defendants further caused the Company to violate IRS rules and

20   regulations in order to avoid having to withhold income and Federal Insurance Compensation

21   Act ("FICA") tax from its executives and employees upon the exercise of Sonic's stock options

22   by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock

23   Options ("ISOs").

24       94.    ISOs are a form of equity compensation that may be provided to a company's

25   employees. ISOs are required to be granted at an exercise price that is no less than the fair

26   market value of the stock on the date of the grant and are entitled to preferential tax treatment as

27   they are not subject to income tax upon exercise of the options but only upon sale of the stock

1  (except for the possible imposition of alternative minimum tax on the option spread at the time of

2  exercise). Stock options that do not qualify as ISOs are considered to be NSOs. NSOs are not

3  entitled to preferential treatment as they are subject to income tax and FICA withholding upon

4  exercise. As a result, a company that fails to withhold income tax and/or FICA upon the exercise

5  of NSOs by its employees would be liable for the amount of the income tax and FICA that the

6  company failed to withhold upon exercise of the stock options, in addition to interest and

7  penalties.

8      95.    By improperly treating its backdated stock options as ISOs, the Individual

9  Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its

10  stock options by its executives and employees in violation of IRS rules and regulations.

11      96.    Meanwhile, the Individual Defendants were causing the Company to grant

12  backdated Sonic stock options to the Option Recipient Defendants. The Company's executives

13  received a significant number of backdated Sonic stock option grants as compensation during the

14  relevant period.

15      97.    Moreover, as alleged herein, in the Reports of the Board Regarding Executive

16  Compensation in the Company's proxy statements filed between 1996 and 2003, Sonic falsely

17  stated that its executive compensation program was designed to "emphasize sustained

18  performance by aligning rewards with shareholder interests" and "motivate executives and

19  employees to achieve Sonic's annual and long-term business goals and encourage behavior

20  toward the fulfillment of those objectives," when, in fact, the executives received instant profits

21  regardless of whether the Company achieved its objectives.

22          **INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES**

23      98.    In a misguided effort to attract and retain employees in a competitive

24  environment, the Individual Defendants exceeded the bounds of the law and legitimate business

25  judgment by perpetrating their stock option backdating scheme. The Individual Defendants'

26  misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers

27  and/or directors of the Company, by virtue of:

28

     a.     colluding with each other to backdate stock option grants;

     b.     colluding with each other to violate GAAP and Section 162(m);

     c.     colluding with each other to produce and disseminate to Sonic shareholders and the market false financial statements that improperly recorded and accounted for the backdated stock option grants and concealed the improper backdating of stock options; and

     d.     colluding with each other to file false proxy statements and false financial statements in order to conceal the improper backdating of stock options.

99.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants who received backdated stock options at the expense of the Company.

100.    On May 26, 2006, *Forbes*, in an article entitled "The Next Big Scandal," quoted former SEC Chairman Harvey L. Pitt as saying "[w]hat's so terrible about backdating options grants? For one thing, it likely renders a company's proxy materials false and misleading. Proxies typically indicate that options are granted at fair market value. But if the grant is backdated, the options value isn't fair – at least not from the vantage point of the company and its shareholders."

101.    On June 18, 2006, in an article entitled "Options Scandal Brewing in Corporate World," SEC Chairman Christopher Cox was quoted as saying "[backdating options] isn't a question about '[w]hoops, I may have (accidentally) crossed a line here . . . . It's a question of knowingly betting on a race that's already been run."

102.    On July 20, 2006, in a press conference announcing the SEC's decision to file civil and criminal charges for stock option backdating against Brocade Communications Systems, SEC Chairman Christopher Cox described the importance of "stamp[ing] out fraudulent stock option backdating." Chairman Cox emphasized that "[t]his issue is important because it goes to the heart of the relationship between a corporation and its shareholders. In order for our system of public ownership to work, the interests of shareholders, and not the personal interests of the company's management or its directors, must be paramount. The proper

use of options for compensation can be an important tool for companies that produces tangible benefits for shareholders. But options backdating strikes at the heart of investor confidence in our capital markets. It deceives investors and the market as a whole about the financial health of companies that cheat in this way. It understates a company's compensation expenses and overstates the company's income."

103.    SEC Chairman Cox further stated at that press conference by stating that, "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is] poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records. It is securities fraud if you present financial statements to the SEC that do not comply with generally accepted accounting principles. There is no requirement that (the defendant) personally profit [to prove that a crime occurred.]"

104.    On September 6, 2006, the United States Senate Committee on Finance ("Finance Committee") held a hearing entitled "Executive Compensation: Backdating to the Future/Oversight of current issues regarding executive compensation including backdating of stock options; and tax treatment of executive compensation, retirement and benefits."

105.    At the hearing, the Chairman of the Finance Committee, Senator Chuck Grassley, in his opening statement, stated: "[options backdating] is behavior that, to put it bluntly, is disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who rigged stock option programs – through a process called 'back-dating' – to further enrich themselves. And as we have found far too often in corporation scandals of recent years, boards of directors were either asleep at the switch, or in some cases, willing accomplices themselves . . . ."

106.    At the hearing, SEC Chairman Christopher Cox, stated, "[r]ather obviously, this fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a violation of accounting rules, and also a violation of the tax laws." The Commissioner of the

1    IRS Mark Everson agreed and further stated, "[p]icking a date on which the stock price was low

2    in comparison with the current price gives the employee the largest potential for gain on the

3    option and makes it possible for the employee to benefit from corporate performance that

4    occurred before the option was granted."

5        107.    In his statement before the Finance Committee Deputy Attorney General Paul J.

6    McNulty, described the practice of stock option backdating "as a brazen abuse of corporate

7    power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders,"

8    and said "[f]or some of those companies that have now disclosed backdated grants, corporate

9    reputations have been tarnished and shareholder value has diminished substantially . . . ."

10       108.    On September 6, 2006, *MarketWatch*, in an article entitled "SEC Probing more

11   than 100 firms on options: Cox," quoted the Chairman of the Senate Committee on Banking,

12   Housing and Urban Affairs, Senator Richard Shelby, saying that manipulation of stock option

13   grant dates "appears to be a black-and-white example of securities fraud," and "[c]orporate

14   officers and directors engaging in this practice are cheating the owners of the company and

15   should be held accountable to the fullest extent possible."

16       109.    In addition to the foregoing, a recent academic study revealed that outside

17   directors of companies were also benefiting from stock option backdating and were recipients of

18   backdated stock option grants, as noted in *The Wall Street Journal* article published on

19   December 18, 2006:

20       A new academic study suggests that many outside directors received
         manipulated stock-option grants, a finding that may help explain why the

21       practice of options backdating wasn't stopped by the boards of some
         companies.

22
         The statistical study, which names no individuals or firms, estimates that

23       1,400 outside directors at 460 companies received questionable option
         grants, suggesting the widespread practice extended well beyond the

24       executive suite.

25       The study is notable because it suggests that outside, or independent,
         directors -- who are supposed to play a special role safeguarding against

26       cozy board relationships with management -- may have been co-opted in
         options backdating by receiving manipulated grants themselves. The New

27       York Stock Exchange requires that a majority of board seats, and all
         compensation- and audit-committee members, be independent . . . .

28

> The evidence "contributes to understanding the possible factors that led to or enabled manipulation to occur," states the unpublished study, which was conducted by professors at Harvard and Cornell universities and the French business school Insead . . . .

110.    Moreover, as *The Wall Street Journal* explained on December 12, 2006, in an article entitled "How Backdating Helped Executives Cut Their Taxes," many corporate insiders have manipulated stock option grant dates *for the additional purpose of cheating on their income taxes*. Far more often than not, stock option grant recipients immediately sell the shares they buy when they exercise stock options, and are required to pay ordinary income tax, as well as payroll taxes, on the difference between the stock's value on the date the stock option was exercised and the stock option's strike price. The highest federal marginal income tax rate is 35%. However, those insiders who hold shares for at least a year will pay a much lower capital gains tax – currently 15% – on any profit between the time they exercise and when they eventually dispose of the shares. This substantially lower tax rate provides an obvious incentive to exercise stock options at a relative low point in the stock price. As *The Wall Street Journal* explained:

> Consider an executive who holds options on 100,000 shares with a strike price of $10. If he exercises and sells when the price is $20, he realizes $1 million in income and must pay $350,000 in income taxes.
>
> If he instead can claim an exercise price of $16, he lowers his income tax to $210,000. If he then sells a year later and the stock is at the same price of $20, he pays $60,000 in capital-gains levies, for a total tax bite of $270,000. *In other words, he has the same $1 million gain but saves $80,000 in taxes*.

111.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, and the costs and expenses incurred in connection with the Company's internal investigation of its historical stock option grant practices.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

112.   Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

113.   Plaintiff is a holder of Sonic common stock and was a holder of Sonic common stock at all times relevant hereto.

114.   Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

115.   As a result of the facts set forth herein, Plaintiff has not made any demand on Sonic's Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

116.   At the time this action commenced, the Board consisted of five directors: defendants Doris, Sauer, Greber, Marguglio and Langley. For all the reasons stated herein, defendants Doris, Sauer, Greber, Margugulio and Langley are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action. Their positions during the relevant period are summarized in the table below:

| Name | Recipient of Backdated Stock Option Grant(s) | Member of the Board during the relevant period | Member of the Audit Committee during the relevant period |
|---|---|---|---|
| Doris | x | x | |
| Sauer | x | x | |
| Greber | | x | x |
| Marguglio | | x | x |
| Langley | | x | x |

117.   At all relevant times, the entire Board was responsible for making all compensation related decisions, including granting stock options:

> The Board does not have a Compensation Committee. Accordingly, *it is the responsibility of the entire Board* to determine the most effective total

executive compensation strategy, *based upon Sonic's business needs and consistent with the shareholders' interests, to administer Sonic's executive compensation plans, programs and policies,* to monitor corporate performance and its relationship to compensation of executive officers, and to take other appropriate actions concerning matters of executive compensation

118.    From 1995 to 2003, the Board knowingly and deliberately backdated stock option grants to make it appear as though the grants were made on dates when the market price of Sonic stock was lower than the market price on the actual grant dates, thereby unjustly benefiting the recipients of the backdated options. By colluding with the recipients of backdated options and others, as alleged herein, the Board has demonstrated that they are unable or unwilling to act independently of the Option Recipient Defendants.

119.    Moreover, by improperly granting backdated stock option grants, the Board knowingly and deliberately participated in and approved the Company's violations of the Plans, GAAP and Section 162(m), as alleged herein, and therefore are substantially likely to be held liable for the misconduct complained of herein.

120.    In addition defendants Doris, Sauer, Greber, Margugulio and Langley are all incapable of disinterestedly considering a demand because they violated California law by failing to schedule, provide notice of, or hold an annual meeting within the 15 month statutory period as required by Cal. Corp. Code § 600(c). These defendants' violation of California law was not and could not have been the result of an exercise of good faith business judgment.

121.    Furthermore, Doris and Sauer are also recipients of the improperly backdated stock options and thus are directly interested in the wrongdoing complained of herein. Moreover, Doris and Sauer are married to each other, and because they share this close personal and professional relationship, are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action against the Individual Defendants.

122.    At all relevant times, the Audit Committee members (Greber, Margugulio and Langley) were charged with the following responsibilities pursuant to Sonic's Audit Committee Charter:

a.    Monitor the integrity of the financial statements of Sonic;

b.    Meet with management and the independent auditor to review and discuss the annual financial statements and the report of the independent auditor thereon and, to the extent the independent auditor or management brings any such matters to the attention of the audit committee, to discuss significant issues encountered in the course of the audit work, including restrictions on the scope of activities, access to required information or the adequacy of internal controls;

c.    Meet quarterly with management and the independent auditor to review and discuss the quarterly financial statements; provided that this responsibility may be delegated to the chairman of the audit committee;

d.    Meet at least once each year in separate executive sessions with management and the independent auditor to discuss matters that the committee or either of these groups believes could significantly affect the financial statements and should be discussed privately;

e.    Provide minutes of audit committee meetings to the board of directors on any significant matters arising from the committee's work; and

f.    Prepare the report required by the rules of the Securities and Exchange Commission to be included in Sonic's annual proxy statement.

123.    Greber, Margugulio and Langley, as members of the Audit Committee, knowingly and deliberately participated in and approved the Company's violations of the Plans, GAAP and Section 162(m), as alleged herein, by approving the filing of and signing false financial statements and other false SEC filings and therefore are substantially likely to be held liable for the misconduct complained of herein

124.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Sonic's proxy statements, the stated purpose of the Company's shareholder approved stock option plans is to closely align the interests of shareholders, executives and employees. However, by backdating stock option grants, the Individual Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Sonic's stock performance. In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

125.    The Individual Defendants could have achieved the stated purpose of aligning the interests of shareholders, executives and employees, by granting those executives and employees additional stock options under their stock option plans or by granting stock options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants. Instead, the Individual Defendants backdated stock option grants in violation of the stock option plans and improperly reported these grants in the Company's financial disclosures to improve Sonic's bottom line.

126.    The practice of backdating stock option grants cannot be a valid exercise of business judgment because it has subjected Sonic to massive liability. Sonic will also suffer tax liabilities for the additional compensation it has to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I
### Against the Individual Defendants for
### Violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

128.    Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

129.    The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein. Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

130.    The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them.

1    The Individual Defendants were among the senior management and directors of the Company

2    and were therefore directly responsible for the fraud alleged herein.

3        131.    The Company relied upon the Individual Defendants' fraud in granting

4    themselves options to purchase shares of the Company's common stock, as alleged herein.

5        132.    As a direct and proximate result of the Individual Defendants' foregoing breaches

6    of fiduciary duties, the Company has sustained substantial damages, as alleged herein.

7                                    **COUNT II**
                        **Against the Individual Defendants for**
8         **Violations of § 14(a) of the Securities Exchange Act**

9        133.    Plaintiff incorporates by reference and realleges each and every allegation set

10   forth above, as though fully set forth herein.

11       134.    Rule 14-A-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that

12   no proxy statement shall contain "any statement which, at the time and in the light of the

13   circumstances under which it is made, is false or misleading with respect to any material fact, or

14   which omits to state any material fact necessary in order to make the statements therein not false

15   or misleading." 17 C.F.R. § 240.14-A-9.

16       135.    The proxy statements described herein violated § 14(a) and Rule 14-A-9 because

17   they omitted material facts, including the fact that the Individual Defendants were causing the

18   Company to engage in a stock option grant backdating scheme, a fact which the Individual

19   Defendants were aware of and/or participated in from at least 1995 to 2003.

20       136.    In the exercise of reasonable care, the Individual Defendants should have known

21   that the proxy statements were materially false and misleading.

22       137.    The misrepresentation and omissions in the proxy statements were material. The

23   proxy statements were an essential link in the accomplishment of the continuation of the

24   Individual Defendants' unlawful stock option grant backdating scheme, as revelations of the

25   truth would have immediately thwarted a continuation of shareholders' endorsement of the

26   directors' positions, the executive officers' compensation and the Company's compensation

27   policies.

28

1    138.    The Company was damaged as a result of the material misrepresentations and

2   omissions in the proxy statements.

3                                    **COUNT III**
                        **Against Leighton and the Director Defendants**
4              **for Violations of § 20(a) of the Securities Exchange Act**

5    139.    Plaintiff incorporates by reference and realleges each and every allegation set

6   forth above, as though fully set forth herein.

7    140.    Leighton and the Director Defendants, by virtue of their positions with the

8   Company and specific acts, were, at the time of the wrongs alleged herein, controlling persons of

9   the Company within the meaning of § 20(a) of the Exchange Act. Leighton and the Director

10  Defendants had the power and influence, and exercised the same, to cause the Company to

11  engage in the illegal conduct and practices complained of herein.

12                                   **COUNT IV**
                         **Against the Individual Defendants**
13                              **for Accounting**

14   141.    Plaintiff incorporates by reference and realleges each and every allegation set

15  forth above, as though fully set forth herein.

16   142.    As alleged in detail herein, each of Individual Defendants had a fiduciary duty to,

17  among other things, refrain from unduly benefiting themselves and other Company insiders at

18  the expense of the Company.

19   143.    As alleged in detail herein, the Individual Defendants breached their fiduciary

20  duties by, among other things, engaging in a scheme to grant backdated stock options to

21  themselves and/or certain other officers and employees of the Company and cover up their

22  misconduct.

23   144.    The Individual Defendants possess complete and unfettered control over the

24  improperly issued stock option grants and the books and records of the Company concerning the

25  details of such improperly backdated stock option grants.

26   145.    As a result of the Individual Defendants' misconduct, the Company has been

27  damaged financially and is entitled to a recovery as a result thereof.

28

1    146.    Plaintiff demands an accounting be made of all stock option grants made to any of

2  the Option Recipient Defendants who received backdated stock options, including, but not

3  limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients

4  of the grants, the dates the stock options were exercised, as well as the disposition of any

5  proceeds received by any of the Option Recipient Defendants who received backdated stock

6  options via sale or other exercise of the grants.

7                                  **COUNT V**
                        **Against the Individual Defendants for**
8        **Breach of Fiduciary Duty and/or Aiding and Abetting**

9    147.    Plaintiff incorporates by reference and realleges each and every allegation set

10  forth above, as though fully set forth herein.

11    148.    As alleged in detail herein, each of the Individual Defendants had a fiduciary duty

12  to, among other things, refrain from unduly benefiting themselves and other Company insiders at

13  the expense of the Company.

14    149.    As alleged in detail herein, the Individual Defendants breached their fiduciary

15  duties by, among other things, engaging in a scheme to grant backdated stock options to

16  themselves and/or certain other officers and employees of the Company and cover up their

17  misconduct.

18    150.    In breach of their fiduciary duties of loyalty and good faith, the Individual

19  Defendants agreed to and did participate with and/or aided and abetted one another in a

20  deliberate course of action designed to divert corporate assets to themselves and/or other

21  Company insiders.

22    151.    The Individual Defendants' foregoing misconduct was not, and could not have

23  been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly

24  benefit the Individual Defendants who received backdated stock options at the expense of the

25  Company.

26    152.    As a direct and proximate result of the Individual Defendants' foregoing breaches

27  of fiduciary duties, the Company has sustained significant damages, as alleged herein.

28

1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

## COUNT VI
### Against the Option Recipient Defendants
### for Unjust Enrichment

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.    The Option Recipient Defendants were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising backdated stock options, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

155.    To remedy the Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such stock options that have been exercised, sold, pledged or otherwise monetized.

## COUNT VII
### Against the Option Recipient Defendants
### for Rescission

156.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

157.    As a result of the acts alleged herein, the stock option contracts between the Option Recipient Defendants and the Company entered into during the relevant period were obtained through the Individual Defendants' fraud, deceit and abuse of control.  Further, the backdated Sonic stock options were illegal grants and thus invalid as they were not authorized in accordance with the terms of the Company's shareholder approved stock option plans.

158.    All contracts which provide for stock option grants to the Option Recipient Defendants and were entered into during the relevant period should, therefore, be rescinded, with all sums paid under such contracts returned to the Company, and all such executory contracts cancelled and declared void.

1

### COUNT VIII
### Against The Director Defendants for
### Violation of Cal. Corp. Code § 600(c)

2

3    159.    Plaintiff incorporates by reference and realleges each and every allegation set

4    forth above, as though fully set forth herein.

5    160.    Pursuant to the California Corporations Code, Sonic is required to hold an annual

6    meeting of shareholders at least once every 15 months.

7    161.    Sonic's last annual meeting was held on November 11, 2005, more than 19

8    months ago.

9

10    162.    In violation of California law, the Director Defendants failed to schedule, provide

11    notice of, or hold an annual meeting for 2006, and have yet to hold an annual meeting in 2007.

12    163.    To remedy the Director Defendants' foregoing violation of California law, the

13    Court should issue an Order requiring the Director Defendants within ten (10) days to: (i)

14    schedule an annual meeting of Sonic's shareholders to be held no later than sixty (30) days from

15    the date of the Order; and (ii) provide to Sonic's shareholders notice of the annual meeting in

16    accordance with Sonic's by-laws.

17

18    WHEREFORE, Plaintiff demands judgment as follows:

19    A.    Issuing an Order requiring the Director Defendants within ten
20    (10) days to: (i) schedule an annual meeting of Sonic's
      shareholders to be held no later than sixty (30) days from the
21    date of the Order; and (ii) provide to Sonic's shareholders
      notice of the annual meeting in accordance with Sonic's by-
      laws;

22

23    B.    Against all of the Individual Defendants and in favor of the
      Company for the amount of damages sustained by the
24    Company as a result of the Individual Defendants' misconduct;

25    C.    Ordering the Option Recipient Defendants to disgorge to the
      Company all of the backdated stock options they received,
26    including the proceeds of any such stock options that have been
      exercised, sold, pledged or otherwise monetized, and imposing
27    a constructive trust thereover;

28    D.    Granting appropriate equitable relief to remedy the Individual

Defendants' breaches of fiduciary duties;

E.    Directing Sonic to take all necessary actions to reform and improve its corporate governance and internal control procedures to comply with applicable law, including, but not limited to, putting forward for a shareholder vote resolutions for amendments to the Company's By-Laws or Articles of Incorporation and taking such other action as may be necessary to place before shareholders for a vote;

F.    Awarding to Plaintiff the costs and disbursements of the action, including reasonable attorneys' fees, accountants' and experts' fees, costs and expenses; and

G.    Granting such other and further relief as the Court deems just and proper.

## JURY TRIAL DEMANDED

Plaintiff demands a trial by jury.

Dated: June 15, 2007

Respectfully submitted,

SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

Alan R. Plutzik, Of Counsel (Bar No. 077785)
Robert M. Bramson, Of Counsel (Bar No. 102006)
L. Timothy Fisher, Of Counsel (Bar No. 191626)
2125 Oak Grove Road, Suite 120
Walnut Creek, CA 94598
Telephone: (925) 945-0770
Facsimile: (925) 945-8792
          -and
Eric L. Zagar
Nichole Browning
J. Daniel Albert
280 King of Prussia Road
Radnor, PA 19087
Telephone: (610) 667-7706
Facsimile: (610) 667-7056

*Attorneys for Plaintiffs*

SHAREHOLDER DERIVATIVE COMPLAINT
-47-

## VERIFICATION

I, James Forseth , hereby verify that I have authorized the filing of the attached

Complaint, that I have reviewed the Complaint, and that the facts therein are true and correct to

the best of my knowledge, information and belief.   I declare under penalty of perjury that the

foregoing is true and correct.

DATE: 6/13/07

JAMES FORSETH