1  SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP
   Alan R. Plutzik, Of Counsel (Bar No. 077785)
2  L. Timothy Fisher, Of Counsel (Bar No. 191626)
   2125 Oak Grove Road, Suite 120
3  Walnut Creek, California 94589
   Telephone: (925) 945-0770
4  Facsimile: (925) 945-8792
           -and-
5  Eric L. Zagar
   Nichole Browning
6  J. Daniel Albert
7  280 King of Prussia Road
   Radnor, PA 19087
8  Telephone: (610) 667-7706
   Facsimile: (610) 667-7056
9

10              **UNITED STATES DISTRICT COURT**

11            **NORTHERN DISTRICT OF CALIFORNIA**

12  _____
    JAMES FORSETH, Derivatively on      )
13  Behalf of Nominal Defendant SONIC   )    Case No. C07-03178 JL
    SOLUTIONS,                          )
14                        Plaintiff,    )    **CORRECTED SHAREHOLDER**
                                        )    **DERIVATIVE COMPLAINT**
15       v.                             )
                                        )
16                                      )
    ROBERT J. DORIS, MARY C. SAUER,     )
17  JAMES A. MOORER, MICHAEL C.         )
    CHILD, ROBERT M. GREBER, PETER J.   )
18  MARGUGLIO, R. WARREN LANGLEY,       )
    A. CLAY LEIGHTON, KIRK PAULSEN,     )
19  MICHAEL J. COSTELLO and             )    **JURY TRIAL DEMANDED**
    CHRISTOPHER A. KRYZAN,              )
20                                      )
21       and                           )
                                        )
22  SONIC SOLUTIONS,                    )
                                        )
23               Nominal Defendant.     )
    _____     )
24

25       Plaintiff James Forseth, by the undersigned attorneys, submits this Shareholder

26  Derivative Complaint (the "Complaint") against the defendants named herein.

27

28

## NATURE AND SUMMARY OF THE ACTION

1.   This is a shareholder's derivative action brought for the benefit of nominal defendant Sonic Solutions ("Sonic" or the "Company") against certain current and former members of its Board of Directors (the "Board") and certain of its executive officers seeking to remedy defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

2.   This action arises from the Individual Defendants'(as defined herein) repeated and egregious breach of their fiduciary duties to the Company and its shareholders by approving and/or acquiescing in the issuance of Sonic stock options to Company executives, employees and directors that were unlawfully "backdated" to provide the recipients with windfall compensation at the direct expense of the Company.

3.   A stock option is the right to purchase a stock for a specified period of time at a fixed price, called the "exercise price" or "strike price." The exercise price is generally fixed to the market price of the stock on the date of grant. If the stock's market price exceeds the exercise price, the stock option holder may exercise the option, by purchasing the stock from the Company at the exercise price and reselling it at the higher market price, profiting from the difference.

4.   When the grant date of a stock option is manipulated to an earlier date on which the stock closed at a lower price – *i.e.*, when the stock option is "backdated" – the grantee pays less for the stock and the corporation, the counterparty to the stock option grant, receives less when the stock option is exercised. When stock options are backdated in this manner for the benefit of insiders (as they were in this case), the stated purposes behind the Company's stock option plans – to align the interests of shareholders, executives and employees – is undermined to the detriment of the Company and its shareholders, because the stock options are already "in the money"[1] when granted. Backdating stock option grants, therefore, represents a direct and

---

[1] "In the money" refers to when the exercise price of a stock option is below the market price of the underlying stock. *See* infra.

CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

-2-

1  continuing waste of valuable corporate assets.

2      5.      To achieve the Company's stated goal of aligning the interests of shareholders,

3  executives and employees, the Company's shareholder-approved stock option plans provide that

4  the exercise price of a stock option "shall in no event be less than the Fair Market Value of the

5  Common Stock subject to the Option on the date of grant." However, the Individual Defendants

6  blatantly violated this and other provisions of the Company's stock option plans by backdating

7  stock options in order to illegally maximize the grantees' profits. As such, and as detailed

8  below, the Individual Defendants' acts were *ultra vires* – unauthorized and beyond the scope of

9  power granted to them.

10     6.      For at least nine years, Sonic's directors, along with its top executive officers,

11 engaged in a secret scheme to grant undisclosed, "in the money" stock options to themselves and

12 others by backdating stock option grants to coincide with low closing stock prices. In fact, in a

13 distinctive pattern from 1995 to 2003, the Individual Defendants backdated stock option grants.

14 Moreover, thirteen out of the Company's sixteen stock option grants (81%) from 1995 to 2003

15 were backdated, all of which were granted to top Sonic executives.[2] The three stock option

16 grants that were not backdated were granted on the day of the Company's Annual Meeting of

17 Shareholders.

18     7.      Plaintiff has also conducted a statistical analysis identical in methodology to that

19 of the Merrill Lynch analysis that has been recently advocated by the Delaware Court of

20 Chancery and a number of federal district courts as indicative of a pattern of backdating.[3] The

21 result of plaintiffs' statistical analysis indicates that over the period from 1995 through 2003 the

22 average annualized return for stock option grants to Sunrise executives based on a twenty day

23

24 _____

25 [2] The pattern excludes certain grants that were cancelled and re-priced pursuant to a Board authorized re-pricing plan instituted on March 3, 1998.

[3] The statistical analysis involved examining the twenty-day return of each individual stock option grant listed in the

26 Company's proxy statement for each year of the relevant period. The twenty-day returns for all the grants made during each individual fiscal year were averaged and then annualized to represent what the twenty-day return would

27 correspond to for an entire year. The average annualized returns for each year during the relevant period were then averaged and compared to the average of an investor's annual return for each year over the relevant period.

28 CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

1   trading window following the date of grant was 642%. This is more than twenty times the

2   average annualized investor return over the same period of 31%.

3        8.     By engaging in this scheme, the Individual Defendants were able to conceal that

4   Sonic was not recording material compensation expenses and was materially overstating the

5   Company's net income or materially understating its net loss from at least 1995 to 2003. By

6   contrast, Sonic has suffered, and will continue to suffer, significant financial and non-monetary

7   damages and injuries, several of which were identified in a report issued by the Center for

8   Financial Research and Analysis on May 16, 2006, entitled "*Options Backdating – Which*

9   *Companies Are at Risk?*":

10
11
12

- **SEC investigation risk** – The SEC has begun information investigations at many companies in recent months and has also begun to call for improved disclosures around all areas of executive compensation.

13
14

- **Accounting restatement risk** – Some companies which have admitted backdating options have accompanied those admissions with financial restatements impacting both the balance sheet and earnings.

15
16

- **Tax/Cash implications** – The change in options from the practice of options backdating may force some companies to restate tax positions for the years in question, which could result in an obligation to pay back taxes.

17
18
19

- **Management credibility risk** – If a reputable management team is found to have repeatedly backdated options, thereby enriching themselves at the expense of shareholder, the reputation of management (and the related stock premium for superior management) could take a hit.

20

21        9.     The Individual Defendants' stock option grant backdating scheme not only

22   surreptitiously and illegally lined the pockets of the recipients of backdated options and caused

23   Sonic to issue materially false financial statements, but also undermined the key purpose of the

24   Company's stock option-based executive compensation, *i.e.*, to align the interests of

25   shareholders, executives and employees. By granting stock options such that they carried a

26   strike price lower than the closing price of the stock on the date of grant, the recipients of

27   backdated options profited immediately upon the award of the stock options without doing

28

1  anything to improve the Company's business or financial condition.

2      10.    As alleged in detail herein, in gross breach of their fiduciary duties as officers

3  and/or directors of Sonic, the Individual Defendants colluded with one another to:

4            a.    improperly backdate grants of stock options to the Company's

5  executive officers and other employees, in violation of the Company's shareholder approved stock option plans;

6            b.    improperly record and account for the backdated stock options, in

7  violation of Generally Accepted Accounting Principles ("GAAP");

8            c.    improperly take tax deductions based on the backdated stock options, in violation of Section 162(m) of the Internal Revenue

9  Code, 26 U.S.C. § 162(m) ("Section 162(m)"); and

10            d.    produce and disseminate false financial statements and other false Securities and Exchange Commission ("SEC") filings to Sonic's

11  shareholders and the market that improperly recorded and accounted for the backdated stock option grants and concealed the

12  improper backdating of stock options.

13      11.    As a result of the Individual Defendants' egregious misconduct, all of which

14  emanated from California, Sonic has sustained significant damages and the recipients of the

15  backdated stock options have garnered unlawful proceeds.

16                                          **JURISDICTION AND VENUE**

17      12.    This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331 in that

18  this Complaint states a federal question. This Court has supplemental jurisdiction over the state

19  law claims asserted herein pursuant to 28 U.S.C. § 1367(a). This action is not a collusive one to

20  confer jurisdiction on a court of the United States which it would not otherwise have.

21      13.    Venue is proper in this district because a substantial portion of the transactions

22  and wrongs complained of herein, including the defendants' primary participation in the

23  wrongful acts detailed herein, occurred in this district. One or more of the defendants either

24  resides in or maintains executive offices in this district, and defendants have received substantial

25  compensation in this district by engaging in numerous activities and conducting business here,

26  which had an effect in this district.

27                                            **PARTIES**

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

1    14.    Plaintiff James Forseth is, and was at all relevant times, a shareholder of nominal

2    defendant Sonic.

3    15.    Nominal defendant Sonic is a California corporation with its principal executive

4    offices located at 101 Rowland Way, Suite 110, Novato, California 94945.  According to its

5    public filings, Sonic develops and markets computer software related to digital media.

6    **Director Defendants**

7    16.    Defendant Robert J. Doris ("Doris") co-founded the Company in 1986 and has

8    served as Chairman of the Board since September 2005.  Doris also served as the Company's

9    Chief Executive Officer ("CEO") and Chairman of the Board from April 2005 to September

10   2005, and as Chairman of the Board, President and CEO from 1986 to April 2005.  Doris is

11   married to defendant Mary C. Sauer.

12   17.    Defendant Mary C. Sauer ("Sauer") co-founded the Company in 1986 and has

13   served as a director since 1986.  Sauer also served as a vice president of the Company from 1986

14   to September 2005, including as Senior Vice President of Marketing and Sales from February

15   1993 to September 2005.  Sauer is married to defendant Doris.

16   18.    Defendant James A. Moorer ("Moorer") served as a director and a vice president

17   of the Company, including Senior Vice President of Audio Development from February 1993 to

18   2001.

19   19.    Defendant Michael C. Child ("Child") served as a director of the Company from

20   August 1993 to September 1999 and as a member of the Audit Committee from at least 1995 to

21   September 1999.

22   20.    Defendant Robert M. Greber ("Greber") has served as a director of the Company

23   since August 1993 and as a member of the Audit Committee since at least 1995, including as

24   Chairman since 2004.

25   21.    Defendant Peter J. Marguglio ("Marguglio") has served as a director of the

26   Company since August 1986 and as a member of the Audit Committee since at least 1995.

27   22.    Defendant R. Warren Langley ("Langley") has served as a director of the

28   CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
     CASE NO. C07-03178 JL

-6-

1 | Company and as a member of the Audit Committee since June 2001.

2 | 23. Defendants Doris, Sauer, Moorer, Child, Greber, Marguglio and Langley shall be
3 | collectively referred to herein as the "Director Defendants."

4 | 24. During the relevant period, the Director Defendants approved the backdated stock
5 | option grants at issue in this case. The Director Defendants also assisted in the preparation of
6 | Sonic's annual and quarterly reports from 1995 through 2006 and reviewed, approved and helped
7 | to prepare proxy statements that Sonic filed with the SEC from 1996 until 2003, which falsely
8 | represented that Sonic stock options were granted at the fair market value of the Company's
9 | common stock on the date of grant, in order to conceal the existence of and their participation in
10 | the Individual Defendants' integrated and continuous scheme to backdate and to conceal the
11 | backdating of stock option grants. The Director Defendants, with knowledge of the stock option
12 | backdating scheme, signed Sonic's financial statements filed with the SEC from 1995 through
13 | 2006, which materially understated the Company's compensation expense and materially
14 | overstated its net income or materially understated its net loss.

15 | **Option Recipient Defendants**

16 | 25. Defendant A. Clay Leighton ("Leighton") has served as the Company's Executive
17 | Vice President and Chief Financial Officer ("CFO") since September 2006. Leighton also
18 | served as the Company's Senior Vice President of Worldwide Operations and Finance and CFO
19 | from January 1999 to September 2006, and as Vice President of Finance from February 1993 to
20 | January 1999.

21 | 26. Defendant Kirk Paulsen ("Paulsen") served in various positions after he joined the
22 | Company in August 1991, including Vice President of Sales from at least 1994 to 1996 and Vice
23 | President for European Operations from 1996 to October 1999.

24 | 27. Defendant Michael J. Costello ("Costello") served as the Company's Vice
25 | President of Operations from at least 1995 to March 1996.

26 | 28. Defendant Christoper A. Kryzan ("Kryzan") served as the Company's Senior
27 | Vice President, Engineering and Marketing from January 1999 to May 2003, and as Vice

28 | CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

1    President of Marketing from March 1996 to January 1999.

2        29.    Collectively, Doris, Sauer, Leighton, Paulsen, Costello and Kryzan are referred to

3    herein as the "Option Recipient Defendants."

4        30.    Collectively, the Option Recipient Defendants and Director Defendants are

5    referred to herein as the "Individual Defendants."

6        31.    As executives and/or Board members, the Option Recipient Defendants approved

7    and/or received the backdated stock option grants at issue in this case.    Certain of these

8    Defendants assisted in the preparation of Sonic's annual and quarterly reports from 1995 through

9    2006 and reviewed, approved and/or helped to prepare proxy statements Sonic filed with the

10   SEC from 1996 through 2003, which falsely represented that Sonic stock options were granted at

11   the fair market value of the Company's common stock on the date of grant, in order to conceal

12   the existence of and their participation in the Individual Defendants' integrated and continuous

13   scheme to backdate and to conceal the backdating of stock option grants.    As a result of the

14   foregoing, the Option Recipient Defendants personally and financially benefited from the

15   backdated stock option grants particularized herein.

16              **DUTIES OF THE INDIVIDUAL DEFENDANTS**

17       32.    By reason of their positions as officers and/or directors of the Company and

18   because of their ability to control the business and corporate affairs of the Company, the

19   Individual Defendants owed the Company and its shareholders the fiduciary obligations of good

20   faith, trust, loyalty and due care, and were and are required to use their utmost ability to control

21   and manage the Company in a fair, just, honest and equitable manner.    The Individual

22   Defendants were and are required to act in furtherance of the best interests of the Company and

23   its shareholders so as to benefit all shareholders equally and not in furtherance of their personal

24   interest or benefit.    Each director and officer of the Company owes to the Company and its

25   shareholders the fiduciary duty to exercise good faith and diligence in the administration of the

26   affairs of the Company and in the use and preservation of its property and assets, and the highest

27   obligations of fair dealing.

28   CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
     CASE NO. C07-03178 JL

                                    -8-

1      33.    The Individual Defendants, because of their positions of control and authority as

2  directors and/or officers of the Company, were able to and did, directly and/or indirectly,

3  exercise control over the wrongful acts complained of herein.

4      34.    To discharge their duties, the Individual Defendants, as the officers and directors

5  of the Company, were required to exercise reasonable and prudent supervision over the

6  management, policies, practices and controls of the Company.  By virtue of such duties, the

7  Individual Defendants were required to, among other things:

8

9           a.     exercise good faith in ensuring that the affairs of the Company were conducted in an efficient, businesslike manner so as to make it possible to provide the highest quality performance of its business;

10

11           b.     exercise good faith in ensuring that the Company was operated in a diligent, honest and prudent manner and complied with all applicable federal and state laws, rules, regulations and requirements, including acting only within the scope of its legal authority;

12

13

14           c.     exercise good faith in supervising the preparation, filing and/or dissemination of financial statements, press releases, audits, reports or other information required by law, and in examining and evaluating any reports or examinations, audits or other financial information concerning the financial condition of the Company;

15

16

17           d.     exercise good faith in ensuring  that the Company's financial statements were prepared in accordance with GAAP; and

18

19           e.     refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

20      35.    The Individual Defendants were responsible for maintaining and establishing

21  adequate internal accounting controls for the Company and to ensure that the Company's

22  financial statements were based on accurate financial information.  According to GAAP, to

23  accomplish the objectives of accurately recording, processing, summarizing and reporting

24  financial data, a corporation must establish an internal accounting control structure.  Among

25  other things, the Individual Defendants, particularly the members of the Audit Committee, were

26  required to:

27

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

(1)     make and keep books, records, and accounts, which, in reasonable detail, accurately and fairly reflect the transactions and dispositions of the assets of the issuer; and

(2)     devise and maintain a system of internal accounting controls sufficient to provide reasonable assurances that –

       (a)     transactions are executed in accordance with management's general or specific authorization; and

       (b)     transactions are recorded as necessary to permit preparation of financial statements in conformity with GAAP.

36.     Sonic's Audit Committee Charter provides that the purposes of the Audit Committee are, among other things, to:

       a.     Monitor the integrity of the financial statements of Sonic;

       b.     Meet with management and the independent auditor to review and discuss the annual financial statements and the report of the independent auditor thereon and, to the extent the independent auditor or management brings any such matters to the attention of the audit committee, to discuss significant issues encountered in the course of the audit work, including restrictions on the scope of activities, access to required information or the adequacy of internal controls;

       c.     Meet quarterly with management and the independent auditor to review and discuss the quarterly financial statements; provided that this responsibility may be delegated to the chairman of the audit committee;

       d.     Meet at least once each year in separate executive sessions with management and the independent auditor to discuss matters that the committee or either of these groups believes could significantly affect the financial statements and should be discussed privately;

       e.     Provide minutes of audit committee meetings to the board of directors on any significant matters arising from the committee's work; and

       f.     Prepare the report required by the rules of the Securities and Exchange Commission to be included in Sonic's annual proxy statement.

37.     Notably, throughout the relevant period, each Report of the Board Regarding Executive Compensation in the Company's proxy statements filed with the SEC stated:

> The Board does not have a Compensation Committee. Accordingly, *it is the responsibility of the entire Board* to determine the most effective total executive compensation strategy, *based upon Sonic's business needs and*

*consistent with the shareholders' interests, to administer Sonic's executive compensation plans, programs and policies,* to monitor corporate performance and its relationship to compensation of executive officers, and to take other appropriate actions concerning matters of executive compensation. (Emphasis added).

## FACTUAL ALLEGATIONS

### The Backdating of Stock Option Grants to the Option Recipient Defendants

38.     Pursuant to the terms of the Company's shareholder approved stock option plans, including the Sonic Solutions Stock Option Plan, the 1989 Stock Plan and the 1998 Stock Option Plan (collectively, the "Plans"), the exercise price of stock options "shall in no event be less than the Fair Market Value of the Common Stock subject to the Option on the date of grant," where "Fair Market Value" means "the closing sales price of the Common Stock reported on the Nasdaq National Market System or, if the Common Stock is not traded on the Nasdaq National Market, the fair market value of the Common Stock as determined by the Administrator in good faith."

39.     Pursuant to Accounting Principles Board Opinion No. 25 ("APB 25"), "Accounting for Stock Issued to Employees," the applicable GAAP provision at the time of the foregoing stock option grants, if the market price on the date of grant exceeds the exercise price of the stock options, the company must recognize the difference as an expense.

40.     Pursuant to Section 162(m), compensation in excess of $1 million per year, including gains on stock options, paid to a corporation's five most highly compensated officers is tax deductible only if: (i) the compensation is payable solely on account of the attainment of one or more performance goals, (ii) the performance goals are determined by a compensation committee comprised solely of two or more outside directors, (iii) the material terms under which the compensation is to be paid, including the performance goals, are disclosed to shareholders and approved by a majority of the vote in a separate shareholder vote before the payment of the compensation, and (iv) before any payment of such compensation, the compensation committee certifies that the performance goals and any other material terms were in fact satisfied.

1    41.    From 1995 to 2003, the Board, according to the Company's proxy statements, had

2    the responsibility "to determine the most effective total executive compensation strategy, based

3    upon Sonic's business needs and consistent with the shareholders' interests, to administer

4    Sonic's executive compensation plans, programs and policies, to monitor corporate performance

5    and its relationship to compensation of executive officers, and to take other appropriate actions

6    concerning matters of executive compensation."

7    42.    The Board knowingly and deliberately violated the terms of the Company's

8    shareholder approved stock option plans, APB 25 and Section 162(m) by knowingly and

9    deliberately backdating grants of stock options to make it appear as though the grants were made

10    on dates when the market price of Sonic stock was lower than the market price on the actual

11    grant dates, thereby benefiting the recipients of the backdated stock options.

12    43.    The entire Board had actual knowledge of the backdating and knew that it

13    violated the terms of the Company's shareholder approved stock option plans, APB 25 and

14    Section 162(m). All of the members of the Board knew that the publicly reported grant dates and

15    statements that the Company followed APB 25 and granted stock options with exercise prices

16    equal to the fair market value of Sonic's common stock on the date of grant were false because

17    the grants were, in fact, backdated. The entire Board knowingly and deliberately approved the

18    scheme with knowledge of its consequences, *e.g.*, its effects on Sonic's financial statements.

19    44.    On November 21, 1995, the Individual Defendants purportedly granted 25,000

20    stock options to Leighton, the Company's Vice President of Finance. The stock options were

21    granted following an enormous decline in Sonic's stock price, as detailed below:

22

23

24

25

26

27

28    CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL



45.    Less than one month later, on December 15, 1995, the Individual Defendants purportedly granted 34,000 stock options to Paulsen and Costello, two of the Company's most highly compensated executives.  The Company's stock price performance surrounding the grant is shown below:



| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 12/15/95 | Paulsen | 20,000 | $6.50 |
| | Costello | 14,000 | $6.50 |

46.    On July 16, 1996, the Individual Defendants purportedly granted 20,000 stock

1  options to Leighton at an exercise price of $5.75, the lowest closing stock price of the first half of

2  Sonic's fiscal year and the second lowest closing stock price of the entire fiscal year, as

3  demonstrated below:



13      47.    On March 3, 1998, when Sonic's closing stock price was $2.6563, the Individual

14  Defendants purportedly re-priced 557,000 stock options to the Company's five most highly

15  compensated executives, at an exercise price of $2.5625, **which was below fair market value.**

16  The exercise price of the re-priced options coincided with the Company's closing stock price on

17  March 20, 1998, which was one of the lowest closing stock prices of the entire fiscal year, as

18  demonstrated below:



| Purported Date of Re-Pricing | Recipient | Number of Stock Options Re-Priced | Exercise Price |
|---|---|---|---|
| 3/3/98 | Doris | 175,000 | $2.5625 |
| | Sauer | 112,000 | $2.5625 |
| | Moorer | 25,000 | $2.5625 |
| | Kryzan | 100,000 | $2.5625 |
| | Leighton | 145,000 | $2.5625 |

48.    On September 2, 1998, the Individual Defendants purportedly granted 190,000 stock options to Doris, Sauer, Kryzan and Leighton, four of the Company's top executive officers, at an exercise price of $1.688.   Interestingly, the Individual Defendants granted the stock options one day after the Company's Annual Meeting of Shareholders.   The Company's closing stock price on the day of the Annual Meeting of Shareholders was $1.75.   With the exception of this grant and the September 1999 grant, the Individual Defendants consistently granted September stock options on the day of Sonic's Annual Meeting of Shareholders.   Sonic's stock price performance surrounding the September 2, 1998 stock option grants is shown below:



9/2/98: SNIC stock options granted at $1.688

| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 9/2/98 | Doris | 85,000 | $1.688 |

| | Sauer | 40,000 | $1.688 |
|---|---|---|---|
| | Kryzan | 40,000 | $1.688 |
| | Leighton | 25,000 | $1.688 |

49.  On August 20, 1999, the Individual Defendants purportedly granted 50,000 stock options to Kryzan and Leighton, some of the Company's most highly compensated executives, at an exercise price of $2.75, which followed a sharp decline in the Company's stock price, as demonstrated below:



| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 8/20/99 | Kryzan | 25,000 | $2.75 |
| | Leighton | 25,000 | $2.75 |

50.  On September 9, 1999, two days after the Company's Annual Meeting of Shareholders, the Individual Defendants purportedly granted Doris, Sauer and Leighton 165,000 stock options at an exercise price of $2.656, Sonic's closing stock price on September 8, 1999, as demonstrated below:



| Purported Date of Grant | Recipient | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 9/9/99 | Doris | 85,000 | $2.656 |
| | Sauer | 40,000 | $2.656 |
| | Leighton | 40,000 | $2.656 |

51.    Purportedly, on April 1, 2000 and September 1, 2000, the Individual Defendants granted 48,000 stock options to Kryzan and 50,000 stock options to Leighton at an exercise price of $1.5630, equal to Sonic's closing stock price on November 30, 2000, as demonstrated below:



| Purported Date of Grant | Name | Number of Stock Options | Exercise Price |
|---|---|---|---|

| 4/1/00 | Kryzan | 48,000 | $1.5630 |
| 9/1/00 | Leighton | 50,000 | $1.5630 |

52.    From July 2001 to December 2001, the Individual Defendants purportedly granted Doris, Sauer, Kryzan and Leighton 500,000 stock options while the Company's stock price performance was stagnant and immediately preceding a significant rise, as demonstrated below:



| Purported Date of Grant | Name | Number of Stock Options | Exercise Price |
|---|---|---|---|
| 7/12/01 | Doris | 90,000 | $1.12 |
| | Sauer | 90,000 | $1.12 |
| | Leighton | 40,000 | $1.12 |
| 10/25/01 | Leighton | 210,000 | $1.17 |
| 12/3/01 | Kryzan | 70,000 | $1.35 |

53.    Despite the flat performance of the Company's stock, the July 12, 2001 and December 3, 2001 stock options had exercise prices coinciding with the lowest closing prices of their respective months, as shown below:

    **a.**    __Stock Price Performance Surrounding the July 12, 2001 Grant__

CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

1



2

3

4

5

6

7

8

9

10

11

12

13     **b.  Stock Price Performance Surrounding the December 3, 2001 Grant**

14



15

16

17

18

19

20

21

22     54.    Each and every one of the aforementioned stock option grants was purportedly

23   dated just after a significant decline, before a significant increase and/or at a particularly low

24   closing price. The reason for the distinctive pattern set forth in the preceding paragraphs is that

25   the purported grant dates set forth therein were not the actual dates on which the stock option

26   grants were made. Indeed, thirteen out of sixteen discretionary grants from November 1995 to

27

28

1  March 2003 fall squarely within this pattern. The three grants that do not fall within this pattern

2  were granted on the day of the Company's Annual Meeting of Shareholders, presumably

3  automatically.  The Board members knowingly and deliberately backdated the stock option

4  grants to make it appear as though the grants were made on dates when the market price of Sonic

5  stock was lower than the market price on the actual grant dates, thereby unduly benefiting the

6  Option Recipient Defendants who received backdated stock option grants.  This improper

7  scheme, which violated the terms of the Company's shareholder approved stock option plans,

8  resulted in stock option grants with lower exercise prices, which improperly increased the value

9  of the stock options and improperly reduced the amounts the Option Recipient Defendants had to

10  pay to the Company upon the exercise of the stock options.

11       55.    Defendants have continued to conceal their backdating scheme and keep the

12  Company's shareholders in the dark by failing to hold an annual shareholders meeting since

13  November 11, 2005.  Pursuant to Cal. Corp. Code § 600(c), "[i]f there is a failure to hold the

14  annual meeting for a period of 60 days after the date designated therefor or, if no date has been

15  designated, for a period of 15 months after the organization of the corporation or after its last

16  annual meeting, the superior court of the proper county may summarily order a meeting to be

17  held upon the application of any shareholder after notice to the corporation giving it an

18  opportunity to be heard."  Defendants' failure to hold an annual meeting for more than 19

19  months following the Company's last annual meeting of the shareholders is a violation of the

20  California Corporations Code.

21  **The Sarbanes-Oxley Act of 2002 ("SOX")**

22       56.    Prior to the enactment of SOX, the Individual Defendants were able to engage in

23  the backdating of stock option grants with relative ease because under federal law they were only

24  required to report stock option grants to the SEC once a year.

25

26

27

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

57.    Twelve out of the fourteen pre-SOX stock option grants[4] disclosed in the Company's proxy statements and Form 4s were dated to coincide with grant dates when the Company's stock was trading at a particularly low price, immediately following significant declines and/or preceding significant increases in the Company's stock price, which is strongly indicative of backdating.

58.    Pursuant to SOX, beginning on August 29, 2002, executives and directors were required to report stock option grants to the SEC within two days of the grant. With this new reporting requirement in place, the pervasive stock option backdating pattern seen previously from 1995 to 2002 for the most part came to an end with one notable exception.

59.    According to the Company's July 29, 2003 proxy statement, the Individual Defendants purportedly granted 100,000 stock options to Leighton on March 11, 2003 at an exercise price of $3.97, the lowest closing stock price of the month. Notwithstanding SOX's explicit two-day reporting requirement, Leighton did not report his March 11, 2003 stock option grants as required. The stock price performance surrounding the March 11, 2003 grant is detailed below:



---

[4] The two grants on September 5, 2000 and September 4, 2001 that were not backdated were presumably granted automatically on the day of the Company's Annual Meeting of Shareholders.

CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

1    60.    In a report released on October 20, 2006, the research firm of Glass, Lewis & Co.

2  conducted an extensive study surrounding the belief that late Form 4 filings can be one of the

3  signs of post-SOX stock option backdating (the "Glass Lewis Report"). Specifically, according

4  to the Glass Lewis Report, the research firm noted that "when we find late Form 4 filings where

5  the price of the underlying stock increased materially between the purported grant date and the

6  day the Form 4 was filed, we believe this raises legitimate questions about whether the grant was

7  backdated."

8                    **Individual Defendants' Dissemination of False Financial Statements**

9    61.    The Individual Defendants prepared, approved and/or signed Sonic's annual and

10  quarterly SEC reports during the relevant period. The Individual Defendants knowingly and

11  deliberately caused the Company to disseminate materially false and misleading statements in

12  the periodic filings that the Individual Defendants prepared, approved and/or signed.

13    62.    The Individual Defendants' stock option grant backdating scheme caused each of

14  Sonic's Forms 10-K and Forms 10-Q for the relevant period to materially understate Sonic's

15  compensation expense and materially overstate the Company's net income or materially

16  understate its net loss, because the Individual Defendants failed to expense the "in the money"

17  portion of Sonic's stock option grants during the period as required by APB 25.

18    63.    As a result of the improper backdating of stock option grants, the Company, with

19  the knowledge, approval and participation of the Individual Defendants,

20          a.    violated the terms of the Company's shareholder approved stock
21                option plans by granting stock options with exercise prices less
                than the fair market value of the stock on the actual date of grant;

22          b.    violated GAAP by failing to recognize compensation expenses
23                incurred when the improperly backdated stock options were
                granted;

24          c.    violated Section 162(m) by taking tax deductions based on stock
25                option grants that were not payable solely on account of the
                attainment of one or more performance goals and violated the
26                terms of the Company's shareholder approved stock option plans;
                and

27          d.    produced and disseminated to Sonic shareholders and the market

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
    CASE NO. C07-03178 JL

                                    -22-

1
2

    false financial statements that improperly recorded and accounted for the backdated stock option grants, and thereby understated compensation expenses and overstated net income or understated net loss.

3      64.    Sonic's financial results for the fiscal years ended in 1996 through 2006 were

4  reported in Annual Reports on Form 10-K filed with the SEC.  Each Form 10-K was

5  simultaneously distributed to Sonic's shareholders and the investing public.  Defendants Doris,

6  Sauer, Moorer, Child, Greber, Marguglio, Langley and Leighton, with the knowledge that the

7  financial statements were false and misleading, each signed at least one Form 10-K filed with the

8  SEC between 1997 and 2006, as detailed below:

9
10

11
12
13
14
15
16

| Defendant Signatory | Forms 10-K for the Fiscal Years Ended In |
|---|---|
| Doris | 1996-2006 |
| Sauer | 1996-2006 |
| Moorer | 1996-1998 |
| Child | 1996-1999 |
| Greber | 1996-2006 |
| Marguglio | 1996-2006 |
| Langley | 2001-2006 |
| Leighton | 1996-2006 |

17      65.    Furthermore, in each of its Form 10-K Annual Reports filed with the SEC from

18  1996 to 2006, the Company, with the knowledge, approval and participation of each of the

19  Individual Defendants, falsely represented that it followed APB 25 to account for stock-based

20  compensation.

21      66.    As alleged previously, APB 25 required the Individual Defendants to record a

22  compensation expense for stock options that were "in the money" on the date of grant.  However,

23  the Individual Defendants did not do so, thereby materially understating Sonic's compensation

24  expense and materially overstating Sonic's net income or materially understating its net loss.

25  These statements were designed to conceal, and did in fact conceal, the fact that the Individual

26  Defendants were engaged in a continuous and systematic scheme of backdating stock option

27  grants to Sonic insiders in violation of the law.

28

CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

1

**False CEO and CFO Certifications**

2       67.    In connection with the filing of certain Annual Reports on Form 10-K during the

3   relevant period, Doris and Leighton filed false Certifications of Chief Executive Officer and

4   Chief Financial Officer Pursuant to 18 U.S.C. Section 1350, as Adopted Pursuant to Section 906

5   of the Sarbanes-Oxley Act of 2002 (the "Certification").

6       68.    In each Certification, Doris and Leighton made certain representations with

7   respect to the accuracy and truthfulness of the information contained therein.  For example, the

8   Company's Form 10-K for the fiscal year ended March 31, 2003, contained the following

9   Certifications made by Doris and Leighton:

10          I, Robert J. Doris/A. Clay Leighton, certify that:

11              1.      I have reviewed this annual report on Form 10-K of Sonic
                        Solutions;
12

13              2.      Based on my knowledge, this annual report does not contain any
                        untrue statement of a material fact or omit to state a material fact
14                      necessary to make the statements made, in light of the
                        circumstances under which such statements were made, not
15                      misleading with respect to the period covered by this annual report;

16              3.      Based on my knowledge, the financial statements, and other
                        financial information included in this annual report, fairly present
17                      in all material respects the financial condition, results of operations
                        and cash flows of the registrant as of, and for, the periods
18                      presented in this annual report;

19              4.      The registrant's other certifying officers and I are responsible for
                        establishing and maintaining disclosure controls and procedures
20                      (as defined in Exchange Act Rules 13a-14 and 15d-14) for the
                        registrant and we have:
21

22                      a)      Designed such disclosure controls and procedures to ensure
                                that material information relating to the registrant,
23                              including its consolidated subsidiaries, is made known to us
                                by others within those entities, particularly during the
24                              period in which this annual report is being prepared;

25                      b)      Evaluated the effectiveness of the registrant's disclosure
                                controls and procedures as of a date within 90 days prior to
26                              the filing date of this annual report (the "Evaluation Date");
                                and
27

28

c)    Presented in this annual report our conclusions about the effectiveness of the disclosure controls and procedures based on our evaluation as of the Evaluation Date;

5.    The registrant's other certifying officers and I have disclosed, based on our most recent evaluation, to the registrant's auditors and the audit committee of registrant's board of directors (or persons performing the equivalent function):

a)    All significant deficiencies in the design or operation of internal controls which could adversely affect the registrant's ability to record, process, summarize and report financial data and have identified for the registrant's auditors any material weaknesses in internal controls; and

b)    Any fraud, whether or not material, that involves management or other employees who have a significant role in the registrant's internal controls; and

6.    The registrant's other certifying officers and I have indicated in this annual report whether or not there were significant changes in internal controls or in other factors that could significantly affect internal controls subsequent to the date of our most recent evaluation, including any corrective actions with regard to significant deficiencies and material weaknesses.

\*        \*        \*        \*        \*        \*        \*

I, Robert J. Doris/A. Clay Leighton, certify, pursuant to 18 U.S.C. Section 1350, as adopted pursuant to Section 906 of the Sarbanes-Oxley Act of 2002, that, to my knowledge:

•    the Annual Report of Sonic Solutions on Form 10-K for the year ended March 31, 2005 fully complies with the requirements of Section 13(a) or 15(d) of the Securities Exchange Act of 1934; and

•    the information contained in such Annual Report fairly presents in all material respects the financial condition and results of operations of Sonic Solutions.

**The Individual Defendants' Concealment of Their Misconduct**

69.    The Individual Defendants caused Sonic to send shareholders proxy statements in connection with the Company's annual shareholder meetings and periodically for special shareholder meetings during the relevant period. The Individual Defendants prepared and/or reviewed each proxy statement filed with the SEC between 1996 and 2003. Moreover, they knew, or were deliberately reckless in not knowing, that the proxy statements were materially false and misleading.

1    70.    Sonic's proxy statements that were sent to shareholders by the Individual

2  Defendants annually in connection with annual shareholders' meeting typically concerned the

3  election of directors, the approval and adoption of Sonic's stock option plan, the authorization to

4  reserve shares for future issuance under the stock option plans, and the ratification of the

5  selection of Sonic's auditor.  Each proxy statement sent to shareholders during this period

6  contained materially false and misleading disclosures or omitted information about Sonic's stock

7  option practices, as alleged herein.

8    71.    From 1996 to 2003, the Company, with the knowledge, approval and participation

9  of the Individual Defendants, for the purpose and with the effect of concealing the improper

10  stock option grant backdating, disseminated to shareholders and filed with the SEC annual proxy

11  statements that falsely reported the dates of stock option grants to the Individual Defendants and

12  falsely stated that stock options were granted to the Individual Defendants with an exercise price

13  "equal to the fair market value of Sonic's common stock on the date of grant," as follows:

a.    Sonic's proxy statement filed with the SEC on July 29, 1996 falsely reported that stock options granted to Leighton were granted on November 21, 1995 and that stock options granted to Paulsen and Costello were granted on December 15, 1995;

b.    Sonic's proxy statement filed with the SEC on July 29, 1997 falsely reported that stock options granted to Leighton were granted on July 16, 1996;

c.    Sonic's proxy statement filed with the SEC on July 21, 1998 falsely reported that stock options re-priced to Doris, Sauer, Moorer, Kryzan and Leighton were re-priced on March 3, 1998;

d.    Sonic's proxy statement filed with the SEC on July 27, 1999 falsely reported that stock options granted to Doris, Sauer, Kryzan and Leighton were granted on September 2, 1998;

e.    Sonic's proxy statement filed with the SEC on July 31, 2000 falsely reported that stock options granted to Kryzan and Leighton were granted on August 20, 1999 and that stock options granted to Doris, Sauer and Leighton were granted on September 9, 1999;

f.    Sonic's proxy statement filed with the SEC on July 24, 2001 falsely reported that stock options granted to Kryzan were granted on April 1, 2000 and that stock options granted to Leighton were granted on September 1, 2000;

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

g. Sonic's proxy statement filed with the SEC on July 25, 2002 falsely reported that stock options granted to Doris, Sauer and Leighton were granted on July 12, 2001, that stock options granted to Leighton were granted on October 25, 2001, and that stock options granted to Kryzan were granted on December 3, 2001; and

h. Sonic's proxy statement filed with the SEC on July 29, 2003 falsely reported that stock options granted to Leighton were granted on March 11, 2003.

72. Moreover, in the Reports of the Board Regarding Executive Compensation in the Company's proxy statements filed between 1996 and 2003, Sonic falsely stated that its executive compensation program was designed to "emphasize sustained performance by aligning rewards with shareholder interests" and "motivate executives and employees to achieve Sonic's annual and long-term business goals and encourage behavior toward the fulfillment of those objectives," when, in fact, the executives received instant profits regardless of whether the Company achieved its objectives.

## SONIC'S FALSE FINANCIAL REPORTING

## IN VIOLATION OF GAAP

73. As a result of the Individual Defendants' improper backdating of stock options, the Individual Defendants caused Sonic to violate GAAP, SEC regulations and Internal Revenue Service ("IRS") rules and regulations.

74. Sonic's financial results for 1995 through 2003 were included in reports filed with the SEC and in other shareholder reports. In these reports, the Individual Defendants represented that Sonic's financial results were presented in a fair manner and in accordance with GAAP.

75. The Individual Defendants' representations were false and misleading as to the financial information reported, as such financial information was not prepared in conformity with GAAP, nor was the financial information "a fair presentation" of the Company's financial condition and operations, causing the financial results to be presented in violation of GAAP and SEC rules.

1    76.    GAAP consists of those principles recognized by the accounting profession as the

2    conventions, rules and procedures necessary to define accepted accounting practice at the

3    particular time.  Regulation S-X, to which the Company is subject as a registrant under the

4    Securities Exchange Act of 1934 ("Exchange Act"), 17 C.F.R. § 210.4-01(a)(1), provides that

5    financial statements filed with the SEC, which are not prepared in compliance with GAAP, are

6    presumed to be misleading and inaccurate.

7

8                                **Violations of GAAP**

9    77.    During the relevant period, the Individual Defendants caused the Company to

10   understate its compensation expense by not properly accounting for its stock options under

11   GAAP, thus overstating the Company's net income or understating the Company's net loss.

12   78.    Under well-settled accounting principles in effect throughout the relevant period,

13   Sonic did not need to record an expense for stock options granted to employees or directors at

14   the current market price ("at the money").  The Company was, however, required to record an

15   expense in its financial statements for any stock options granted below the current market price

16   ("in the money").  In order to provide Sonic executives and employees with far more lucrative

17   "in the money" stock options, while avoiding having to inform shareholders about millions of

18   dollars incurred by the Company in compensation expenses (and without paying the IRS millions

19   of dollars in employment taxes), the Individual Defendants systematically falsified Company

20   records to create the false appearance that stock options had been granted at the market price on

21   an earlier date.

22   79.    Throughout the relevant period, Sonic accounted for stock options using the

23   intrinsic method described in APB 25, employers were required to record as an expense on their

24   financial statements the "intrinsic value" of a fixed stock option on its "measurement date."  A

25   stock option that is "in the money" on the measurement date has intrinsic value, and the

26   difference between its exercise price and the quoted market price must be recorded as

27   compensation expense to be recognized over the vesting period of the option.  Stock options that

28   CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
     CASE NO. C07-03178 JL

                                           -28-

1  are "at the money" or "out of the money" on the measurement date need not be expensed.

2  Excluding non-employee directors, APB 25 required employers to record compensation

3  expenses on stock options granted to non-employees irrespective of whether they were "in the

4  money" or not on the date of grant.

5                              **Sonic's GAAP Violations Were Material**

6          80.    Sonic's false and misleading relevant period statements and omissions regarding

7  its accounting were material, particularly in light of SEC guidance on materiality.  SEC Staff

8  Accounting Bulletin ("SAB") Topic 1M, Materiality, summarizes GAAP definitions of

9  materiality.  Among other items, SAB Topic 1M says: "A matter is 'material' if there is a

10 substantial likelihood that a reasonable person would consider it important." It also stresses that

11 materiality requires qualitative, as well as quantitative, considerations.  For example, if a known

12 misstatement would cause a significant market reaction, that reaction should be taken into

13 account in determining the materiality of the misstatement.

14         81.    SAB Topic 1M further states:

15                 among the considerations that may well render material a
16                 quantitatively small misstatement of a financial statement item are –

17                         *        *        *
                   whether the misstatement masks a change in earnings or other
18                 trends

19                 whether the misstatement hides a failure to meet analysts'
                   consensus expectations for the enterprise

20                         *        *        *
21                 whether the misstatement concerns a segment or other portion of
                   the registrant's business that has been identified as playing a significant
22                 role in the registrant's operations or profitability.

23         82.    SAB Topic 1M also says that an intentional misstatement of even immaterial

24 items may be illegal and constitute fraudulent financial reporting.

25         83.    Sonic's misstatements satisfy these criteria and thus were material from both a

26 quantitative and qualitative perspective.

27         **Sonic's Financial Statements Violated Fundamental Concepts of GAAP**

28 CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
   CASE NO. C07-03178 JL
                                            -29-

84.    Due to these accounting improprieties, the Company presented its financial results and statements in a manner that violated GAAP, which are described by the following statements:

(a)    The principle that interim financial reporting should be based upon the same accounting principles and practices used to prepare annual financial statements (Accounting Principles Board Opinion No. 28, ¶10);

(b)    The principle that financial reporting should provide information that is useful to existing and potential investors and creditors and other users in making rational investment, credit and similar decisions (Financial Accounting Standards Board ("FASB") Statement of Concepts No. 1, ¶34);

(c)    The principle that financial reporting should provide information about the economic resources of an enterprise, the claims to those resources, and the effects of transactions, events and circumstances that change resources and claims to those resources (FASB Statement of Concepts No. 1, ¶40);

(d)    The principle that financial reporting should provide information about how management of an enterprise has discharged its stewardship responsibility to stockholders for the use of enterprise resources entrusted to it.  To the extent that management offers securities of the enterprise to the public, it voluntarily accepts wider responsibilities for accountability to prospective investors and to the public in general (FASB Statement of Concepts No. 1, ¶50);

(e)    The principle that financial reporting should be reliable in that it represents what it purports to represent (FASB Statement of Concepts No. 2, ¶¶58-59);

(f)    The principle of completeness, which means that nothing is left out of the information that may be necessary to insure that it validly represents underlying events and conditions (FASB Statement of Concepts No. 2, ¶79); and

(g)    The principle that conservatism be used as a prudent reaction to uncertainty to try to ensure that uncertainties and risks inherent in business situations are adequately considered (FASB Statement of Concepts No. 2, ¶¶95, 97).

85.    Further, the undisclosed adverse information concealed by the Individual Defendants during the relevant period is the type of information which, because of SEC regulations, regulations of the national stock exchanges and customary business practice, is expected by investors and securities analysts to be disclosed and is known by corporate officials

1    and their legal and financial advisors to be the type of information which is expected to be and
2    must be disclosed.

3                    **Sonic's Financial Statements Violated SEC Regulations**

4        86.    During the relevant period, the Individual Defendants caused Sonic to violate
5    SEC regulations by failing to disclose that the Company's senior executives had been granted
6    backdated stock options.

7        87.    Under SEC Regulations, Item 8 of Form 14-A and Item 11 of Form 10-K, an
8    issuer must furnish information required by Item 402 of Regulation S-K [17 C.F.R. § 229.303].
9    Item 402(b) and (c) require a company to provide both a Summary Compensation Table and an
10   Option/SAR Grants table identifying the compensation of the named executive officers – the
11   Company's CEO and its next four most highly paid executives.  Item 402 requires particularized
12   disclosures involving a company's stock option grants in the last fiscal year.  In the summary
13   compensation table, the issuer must identify in a column "other annual compensation" received
14   by the named executives that is not properly categorized as salary or bonus, including any
15   "[a]bove market or preferential earnings on restricted stock, options, SARs or deferred
16   compensation" paid to the officer during the period.  Item 402(b)(2)(iii)(C)(2).  In the option
17   grant table, the issuer must identify in a column "[t]he per-share exercise or base price of the
18   options. . . . If such exercise or base price is less than the market price of the underlying security
19   on the date of grant, a separate, adjoining column shall be added showing market price on the
20   date of grant. . . ."  Item 402(c)(2)(iv).

21       88.    The Individual Defendants caused Sonic to violate SEC regulations by failing to
22   disclose that the Company's named executive officers had been granted stock options with
23   exercise prices below the market value on the date the Board approved the grant.

24                    **Violations of IRS Rules and Regulations**

25       89.    During the relevant period, the Individual Defendants further caused Sonic to
26   violate IRS rules and regulations due to its improper accounting for the backdated stock options.

27

28   CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
     CASE NO. C07-03178 JL

1  As a result, the Company's tax liabilities were understated, exposing Sonic to potential amounts
2  owed for back taxes, penalties and interest to the IRS for improperly reporting compensation.

3          90.     The Individual Defendants caused the Company to violate Section § 162(m),
4  which generally limits a publicly traded company's tax deductions for compensation paid to each
5  of its named executive officers to $1 million unless the pay is determined to be "performance-
6  based." In order for compensation to be performance-based, the Compensation Committee or
7  Board must have set pre-established and objective performance goals. The goals must then be
8  approved by the shareholders. Section 162(m) defines stock options as performance-based
9  provided they are issued at an exercise price that is no less than the fair market value of the stock
10 on the date of the grant. Accordingly, properly issued stock options do not have to be taken into
11 account in calculating whether an executive's compensation has exceeded the $1 million
12 compensation cap.

13         91.     Section 162(m), known as the $1 million rule, was enacted in 1993 in order to tie
14 top executives' soaring pay packages more closely to a company's performance. This change in
15 the tax law turned compensation practices for a company's top executives away from straight
16 salary-based compensation to performance-based compensation, including stock options.
17 According to former SEC Chairman Harvey L. Pitt: "What [162[m]] did was create incentives to
18 find other forms of compensation so people could get over the $1 million threshold without
19 running afoul of the code."

20         92.     The Individual Defendants caused Sonic to violate Section 162(m) by providing
21 backdated stock options to the Company's named executive officers, which were granted with
22 exercise prices that were less than the fair market value of the stock on the date of the grant. As
23 a result all of the income resulting from the exercise of the stock options must be included for
24 purposes of calculating whether the named executive's compensation exceeds the $1 million cap
25 for federal tax purposes.

26         93.     The Individual Defendants further caused the Company to violate IRS rules and
27 regulations in order to avoid having to withhold income and Federal Insurance Compensation

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
    CASE NO. C07-03178 JL

                                              -32-

1    Act ("FICA") tax from its executives and employees upon the exercise of Sonic's stock options

2    by improperly accounting for its Nonqualified Stock Options ("NSOs") as Incentive Stock

3    Options ("ISOs").

4         94.    ISOs are a form of equity compensation that may be provided to a company's

5    employees.    ISOs are required to be granted at an exercise price that is no less than the fair

6    market value of the stock on the date of the grant and are entitled to preferential tax treatment as

7    they are not subject to income tax upon exercise of the options but only upon sale of the stock

8    (except for the possible imposition of alternative minimum tax on the option spread at the time of

9    exercise).    Stock options that do not qualify as ISOs are considered to be NSOs.    NSOs are not

10   entitled to preferential treatment as they are subject to income tax and FICA withholding upon

11   exercise.    As a result, a company that fails to withhold income tax and/or FICA upon the exercise

12   of NSOs by its employees would be liable for the amount of the income tax and FICA that the

13   company failed to withhold upon exercise of the stock options, in addition to interest and

14   penalties.

15        95.    By improperly treating its backdated stock options as ISOs, the Individual

16   Defendants failed to provide proper income tax and FICA withholdings upon the exercise of its

17   stock options by its executives and employees in violation of IRS rules and regulations.

18        96.    Meanwhile, the Individual Defendants were causing the Company to grant

19   backdated Sonic stock options to the Option Recipient Defendants.    The Company's executives

20   received a significant number of backdated Sonic stock option grants as compensation during the

21   relevant period.

22        97.    Moreover, as alleged herein, in the Reports of the Board Regarding Executive

23   Compensation in the Company's proxy statements filed between 1996 and 2003, Sonic falsely

24   stated that its executive compensation program was designed to "emphasize sustained

25   performance by aligning rewards with shareholder interests" and "motivate executives and

26   employees to achieve Sonic's annual and long-term business goals and encourage behavior

27   toward the fulfillment of those objectives," when, in fact, the executives received instant profits

28   CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
     CASE NO. C07-03178 JL

1   regardless of whether the Company achieved its objectives.

2   ## INDIVIDUAL DEFENDANTS' BREACHES OF FIDUCIARY DUTIES

3   98.     In a misguided effort to attract and retain employees in a competitive

4   environment, the Individual Defendants exceeded the bounds of the law and legitimate business

5   judgment by perpetrating their stock option backdating scheme.  The Individual Defendants'

6   misconduct was unjustifiable and constituted a gross breach of their fiduciary duties as officers

7   and/or directors of the Company, by virtue of:

8           a.    colluding with each other to backdate stock option grants;

9           b.    colluding with each other to violate GAAP and Section 162(m);

10          c.    colluding with each other to produce and disseminate to Sonic
11                shareholders and the market false financial statements that
                  improperly recorded and accounted for the backdated stock option
12                grants and concealed the improper backdating of stock options; and

13          d.    colluding with each other to file false proxy statements and false
                  financial statements in order to conceal the improper backdating of
14                stock options.

15  99.     The Individual Defendants' foregoing misconduct was not, and could not have

16  been, an exercise of good faith business judgment.  Rather, it was intended to, and did, unduly

17  benefit the Individual Defendants who received backdated stock options at the expense of the

18  Company.

19  100.    On May 26, 2006, *Forbes*, in an article entitled "The Next Big Scandal," quoted

20  former SEC Chairman Harvey L. Pitt as saying "[w]hat's so terrible about backdating options

21  grants?  For one thing, it likely renders a company's proxy materials false and misleading.

22  Proxies typically indicate that options are granted at fair market value.  But if the grant is

23  backdated, the options value isn't fair – at least not from the vantage point of the company and

24  its shareholders."

25  101.    On June 18, 2006, in an article entitled "Options Scandal Brewing in Corporate

26  World," SEC Chairman Christopher Cox was quoted as saying "[backdating options] isn't a

27  question about '[w]hoops, I may have (accidentally) crossed a line here . . . .  It's a question of

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
    CASE NO. C07-03178 JL

1   knowingly betting on a race that's already been run."

2       102.    On July 20, 2006, in a press conference announcing the SEC's decision to file

3   civil and criminal charges for stock option backdating against Brocade Communications

4   Systems, SEC Chairman Christopher Cox described the importance of "stamp[ing] out

5   fraudulent stock option backdating." Chairman Cox emphasized that "[t]his issue is important

6   because it goes to the heart of the relationship between a corporation and its shareholders. In

7   order for our system of public ownership to work, the interests of shareholders, and not the

8   personal interests of the company's management or its directors, must be paramount. The proper

9   use of options for compensation can be an important tool for companies that produces tangible

10  benefits for shareholders. But options backdating strikes at the heart of investor confidence in

11  our capital markets. It deceives investors and the market as a whole about the financial health of

12  companies that cheat in this way. It understates a company's compensation expenses and

13  overstates the company's income."

14      103.    SEC Chairman Cox further stated at that press conference by stating that,

15  "[backdating in many cases] makes a hash of (companies') financial statements . . . [and is]

16  poisonous [to efficient markets]. . . . It is securities fraud if you falsify books and records. It is

17  securities fraud if you present financial statements to the SEC that do not comply with generally

18  accepted accounting principles. There is no requirement that (the defendant) personally profit [to

19  prove that a crime occurred.]"

20      104.    On September 6, 2006, the United States Senate Committee on Finance ("Finance

21  Committee") held a hearing entitled "Executive Compensation: Backdating to the

22  Future/Oversight of current issues regarding executive compensation including backdating of

23  stock options; and tax treatment of executive compensation, retirement and benefits."

24      105.    At the hearing, the Chairman of the Finance Committee, Senator Chuck Grassley,

25  in his opening statement, stated: "[options backdating] is behavior that, to put it bluntly, is

26  disgusting and repulsive. It is behavior that ignores the concept of an 'honest day's work for an

27  honest day's pay' and replaces it with a phrase that we hear all too often today, 'I'm going to get

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
    CASE NO. C07-03178 JL

1   mine.' . . . [S]hareholders and rank-and-file employees were ripped off by senior executives who

2   rigged stock option programs – through a process called 'back-dating' – to further enrich

3   themselves. And as we have found far too often in corporation scandals of recent years, boards

4   of directors were either asleep at the switch, or in some cases, willing accomplices themselves . .

5   . ."

6      106.   At the hearing, SEC Chairman Christopher Cox, stated, "[r]ather obviously, this

7   fact pattern [of backdating options] results in a violation of the SEC's disclosure rules, a

8   violation of accounting rules, and also a violation of the tax laws." The Commissioner of the

9   IRS Mark Everson agreed and further stated, "[p]icking a date on which the stock price was low

10  in comparison with the current price gives the employee the largest potential for gain on the

11  option and makes it possible for the employee to benefit from corporate performance that

12  occurred before the option was granted."

13     107.   In his statement before the Finance Committee Deputy Attorney General Paul J.

14  McNulty, described the practice of stock option backdating "as a brazen abuse of corporate

15  power to artificially inflate the salaries of corporate wrongdoers at the expense of shareholders,"

16  and said "[f]or some of those companies that have now disclosed backdated grants, corporate

17  reputations have been tarnished and shareholder value has diminished substantially . . . ."

18     108.   On September 6, 2006, *MarketWatch*, in an article entitled "SEC Probing more

19  than 100 firms on options: Cox," quoted the Chairman of the Senate Committee on Banking,

20  Housing and Urban Affairs, Senator Richard Shelby, saying that manipulation of stock option

21  grant dates "appears to be a black-and-white example of securities fraud," and "[c]orporate

22  officers and directors engaging in this practice are cheating the owners of the company and

23  should be held accountable to the fullest extent possible."

24     109.   In addition to the foregoing, a recent academic study revealed that outside

25  directors of companies were also benefiting from stock option backdating and were recipients of

26  backdated stock option grants, as noted in *The Wall Street Journal* article published on

27  December 18, 2006:

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
    CASE NO. C07-03178 JL

> A new academic study suggests that many outside directors received manipulated stock-option grants, a finding that may help explain why the practice of options backdating wasn't stopped by the boards of some companies.
>
> The statistical study, which names no individuals or firms, estimates that 1,400 outside directors at 460 companies received questionable option grants, suggesting the widespread practice extended well beyond the executive suite.
>
> The study is notable because it suggests that outside, or independent, directors -- who are supposed to play a special role safeguarding against cozy board relationships with management -- may have been co-opted in options backdating by receiving manipulated grants themselves. The New York Stock Exchange requires that a majority of board seats, and all compensation- and audit-committee members, be independent . . ..
>
> The evidence "contributes to understanding the possible factors that led to or enabled manipulation to occur," states the unpublished study, which was conducted by professors at Harvard and Cornell universities and the French business school Insead . . . .

110.    Moreover, as *The Wall Street Journal* explained on December 12, 2006, in an article entitled "How Backdating Helped Executives Cut Their Taxes," many corporate insiders have manipulated stock option grant dates *for the additional purpose of cheating on their income taxes*. Far more often than not, stock option grant recipients immediately sell the shares they buy when they exercise stock options, and are required to pay ordinary income tax, as well as payroll taxes, on the difference between the stock's value on the date the stock option was exercised and the stock option's strike price. The highest federal marginal income tax rate is 35%. However, those insiders who hold shares for at least a year will pay a much lower capital gains tax – currently 15% – on any profit between the time they exercise and when they eventually dispose of the shares. This substantially lower tax rate provides an obvious incentive to exercise stock options at a relative low point in the stock price. As *The Wall Street Journal* explained:

> Consider an executive who holds options on 100,000 shares with a strike price of $10. If he exercises and sells when the price is $20, he realizes $1 million in income and must pay $350,000 in income taxes.
>
> If he instead can claim an exercise price of $16, he lowers his income tax to $210,000. If he then sells a year later and the stock is at the same price of $20, he pays $60,000 in capital-gains levies, for a total tax bite of

CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

$270,000. *In other words, he has the same $1 million gain but saves $80,000 in taxes.*

111.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained millions of dollars in damages, including, but not limited to, the loss of funds paid to the Company upon the exercise of stock options resulting from the difference between the fair market value of the stock option on the true date of grant and the price that was actually paid as a result of the backdated stock option grant, and the costs and expenses incurred in connection with the Company's internal investigation of its historical stock option grant practices.

## DERIVATIVE AND DEMAND EXCUSED ALLEGATIONS

112.    Plaintiff brings this action derivatively in the right and for the benefit of the Company to redress the Individual Defendants' breaches of fiduciary duties, unjust enrichment, statutory violations and other violations of law.

113.    Plaintiff is a holder of Sonic common stock and was a holder of Sonic common stock at all times relevant hereto.

114.    Plaintiff will adequately and fairly represent the interests of the Company and its shareholders in enforcing and prosecuting their rights.

115.    As a result of the facts set forth herein, Plaintiff has not made any demand on Sonic's Board to institute this action against the Individual Defendants. Such demand would be a futile and useless act because the Board is incapable of making an independent and disinterested decision to institute and vigorously prosecute this action.

116.    At the time this action commenced, the Board consisted of five directors: defendants Doris, Sauer, Greber, Marguglio and Langley. For all the reasons stated herein, defendants Doris, Sauer, Greber, Margugulio and Langley are incapable of independently and disinterestedly considering a demand to commence and vigorously prosecute this action. Their positions during the relevant period are summarized in the table below:

| Name | Recipient of Backdated Stock Option Grant(s) | Member of the Board during the relevant period | Member of the Audit Committee during the relevant period |
|------|------|------|------|
| Doris | x | x | |
| Sauer | x | x | |
| Greber | | x | x |
| Marguglio | | x | x |
| Langley | | x | x |

117.  At all relevant times, the entire Board was responsible for making all compensation related decisions, including granting stock options:

> The Board does not have a Compensation Committee. Accordingly, *it is the responsibility of the entire Board* to determine the most effective total executive compensation strategy, *based upon Sonic's business needs and consistent with the shareholders' interests, to administer Sonic's executive compensation plans, programs and policies*, to monitor corporate performance and its relationship to compensation of executive officers, and to take other appropriate actions concerning matters of executive compensation

118.  From 1995 to 2003, the Board knowingly and deliberately backdated stock option grants to make it appear as though the grants were made on dates when the market price of Sonic stock was lower than the market price on the actual grant dates, thereby unjustly benefiting the recipients of the backdated options. By colluding with the recipients of backdated options and others, as alleged herein, the Board has demonstrated that they are unable or unwilling to act independently of the Option Recipient Defendants.

119.  Moreover, by improperly granting backdated stock option grants, the Board knowingly and deliberately participated in and approved the Company's violations of the Plans, GAAP and Section 162(m), as alleged herein, and therefore are substantially likely to be held liable for the misconduct complained of herein.

120.  In addition defendants Doris, Sauer, Greber, Margugulio and Langley are all incapable of disinterestedly considering a demand because they violated California law by failing to schedule, provide notice of, or hold an annual meeting within the 15 month statutory period as

1  required by Cal. Corp. Code § 600(c). These defendants' violation of California law was not and

2  could not have been the result of an exercise of good faith business judgment.

3      121.    Furthermore, Doris and Sauer are also recipients of the improperly backdated

4  stock options and thus are directly interested in the wrongdoing complained of herein.

5  Moreover, Doris and Sauer are married to each other, and because they share this close personal

6  and professional relationship, are incapable of independently and disinterestedly considering a

7  demand to commence and vigorously prosecute this action against the Individual Defendants.

8      122.    At all relevant times, the Audit Committee members (Greber, Margugulio and

9  Langley) were charged with the following responsibilities pursuant to Sonic's Audit Committee

10  Charter:

11    a.    Monitor the integrity of the financial statements of Sonic;

12    b.    Meet with management and the independent auditor to review and
13  discuss the annual financial statements and the report of the
   independent auditor thereon and, to the extent the independent
14  auditor or management brings any such matters to the attention of
   the audit committee, to discuss significant issues encountered in
15  the course of the audit work, including restrictions on the scope of
   activities, access to required information or the adequacy of
   internal controls;

16    c.    Meet quarterly with management and the independent auditor to
17  review and discuss the quarterly financial statements; provided
   that this responsibility may be delegated to the chairman of the
18  audit committee;

19    d.    Meet at least once each year in separate executive sessions with
   management and the independent auditor to discuss matters that
20  the committee or either of these groups believes could
   significantly affect the financial statements and should be
21  discussed privately;

22    e.    Provide minutes of audit committee meetings to the board of
   directors on any significant matters arising from the committee's
23  work; and

24    f.    Prepare the report required by the rules of the Securities and
   Exchange Commission to be included in Sonic's annual proxy
25  statement.

26      123.    Greber, Margugulio and Langley, as members of the Audit Committee,

27  knowingly and deliberately participated in and approved the Company's violations of the Plans,

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
   CASE NO. C07-03178 JL

-40-

GAAP and Section 162(m), as alleged herein, by approving the filing of and signing false financial statements and other false SEC filings and therefore are substantially likely to be held liable for the misconduct complained of herein

124.    Furthermore, demand is excused because the misconduct complained of herein was not, and could not have been, an exercise of good faith business judgment. As represented in Sonic's proxy statements, the stated purpose of the Company's shareholder approved stock option plans is to closely align the interests of shareholders, executives and employees. However, by backdating stock option grants, the Individual Defendants undermined the purpose of the stock option plans by awarding employees compensation that had intrinsic value regardless of Sonic's stock performance. In effect, this practice was nothing more than secret handouts to executives and employees at the expense of unsuspecting shareholders.

125.    The Individual Defendants could have achieved the stated purpose of aligning the interests of shareholders, executives and employees, by granting those executives and employees additional stock options under their stock option plans or by granting stock options at a price less than the fair market value on the date of the grant and simply disclosing and expensing these grants. Instead, the Individual Defendants backdated stock option grants in violation of the stock option plans and improperly reported these grants in the Company's financial disclosures to improve Sonic's bottom line.

126.    The practice of backdating stock option grants cannot be a valid exercise of business judgment because it has subjected Sonic to massive liability. Sonic will also suffer tax liabilities for the additional compensation it has to expense, and it has tarnished its reputation in the investment community through this deliberate and calculated conduct.

## COUNT I
### Against the Individual Defendants for
### Violations of § 10(b) and Rule 10b-5 of the Securities Exchange Act

127.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

-41-

128.    Throughout the relevant period, the Individual Defendants individually and in concert, directly and indirectly, by the use and means of instrumentalities of interstate commerce and/or of the mails, intentionally or recklessly employed devices, schemes and artifices to defraud and engaged in acts, practices and a course of business which operated as a fraud and deceit upon the Company.

129.    The Individual Defendants, as top executive officers and/or directors of the Company, are liable as direct participants in the wrongs complained of herein.  Through their positions of control and authority as officers and/or directors of the Company, each of the Individual Defendants was able to and did control the conduct complained of herein.

130.    The Individual Defendants acted with scienter in that they either had actual knowledge of the fraud set forth herein, or acted with reckless disregard for the truth in that they failed to ascertain and to disclose the true facts, even though such facts were available to them. The Individual Defendants were among the senior management and directors of the Company and were therefore directly responsible for the fraud alleged herein.

131.    The Company relied upon the Individual Defendants' fraud in granting themselves options to purchase shares of the Company's common stock, as alleged herein.

132.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained substantial damages, as alleged herein.

**COUNT II**
**Against the Individual Defendants for**
**Violations of § 14(a) of the Securities Exchange Act**

133.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

134.    Rule 14-A-9, promulgated pursuant to § 14(a) of the Exchange Act, provides that no proxy statement shall contain "any statement which, at the time and in the light of the circumstances under which it is made, is false or misleading with respect to any material fact, or which omits to state any material fact necessary in order to make the statements therein not false or misleading."  17 C.F.R. § 240.14-A-9.

CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

-42-

135. The proxy statements described herein violated § 14(a) and Rule 14-A-9 because they omitted material facts, including the fact that the Individual Defendants were causing the Company to engage in a stock option grant backdating scheme, a fact which the Individual Defendants were aware of and/or participated in from at least 1995 to 2003.

136. In the exercise of reasonable care, the Individual Defendants should have known that the proxy statements were materially false and misleading.

137. The misrepresentation and omissions in the proxy statements were material. The proxy statements were an essential link in the accomplishment of the continuation of the Individual Defendants' unlawful stock option grant backdating scheme, as revelations of the truth would have immediately thwarted a continuation of shareholders' endorsement of the directors' positions, the executive officers' compensation and the Company's compensation policies.

138. The Company was damaged as a result of the material misrepresentations and omissions in the proxy statements.

## COUNT III
### Against Leighton and the Director Defendants
### for Violations of § 20(a) of the Securities Exchange Act

139. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

140. Leighton and the Director Defendants, by virtue of their positions with the Company and specific acts, were, at the time of the wrongs alleged herein, controlling persons of the Company within the meaning of § 20(a) of the Exchange Act. Leighton and the Director Defendants had the power and influence, and exercised the same, to cause the Company to engage in the illegal conduct and practices complained of herein.

## COUNT IV
### Against the Individual Defendants
### for Accounting

141. Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

142.   As alleged in detail herein, each of Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

143.   As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to themselves and/or certain other officers and employees of the Company and cover up their misconduct.

144.   The Individual Defendants possess complete and unfettered control over the improperly issued stock option grants and the books and records of the Company concerning the details of such improperly backdated stock option grants.

145.   As a result of the Individual Defendants' misconduct, the Company has been damaged financially and is entitled to a recovery as a result thereof.

146.   Plaintiff demands an accounting be made of all stock option grants made to any of the Option Recipient Defendants who received backdated stock options, including, but not limited to, the dates of the grants, the amounts of the grants, the value of the grants, the recipients of the grants, the dates the stock options were exercised, as well as the disposition of any proceeds received by any of the Option Recipient Defendants who received backdated stock options via sale or other exercise of the grants.

## COUNT V
### Against the Individual Defendants for
### Breach of Fiduciary Duty and/or Aiding and Abetting

147.   Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

148.   As alleged in detail herein, each of the Individual Defendants had a fiduciary duty to, among other things, refrain from unduly benefiting themselves and other Company insiders at the expense of the Company.

149.   As alleged in detail herein, the Individual Defendants breached their fiduciary duties by, among other things, engaging in a scheme to grant backdated stock options to

CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
CASE NO. C07-03178 JL

-44-

themselves and/or certain other officers and employees of the Company and cover up their misconduct.

150.    In breach of their fiduciary duties of loyalty and good faith, the Individual Defendants agreed to and did participate with and/or aided and abetted one another in a deliberate course of action designed to divert corporate assets to themselves and/or other Company insiders.

151.    The Individual Defendants' foregoing misconduct was not, and could not have been, an exercise of good faith business judgment. Rather, it was intended to, and did, unduly benefit the Individual Defendants who received backdated stock options at the expense of the Company.

152.    As a direct and proximate result of the Individual Defendants' foregoing breaches of fiduciary duties, the Company has sustained significant damages, as alleged herein.

### COUNT VI
### Against the Option Recipient Defendants
### for Unjust Enrichment

153.    Plaintiff incorporates by reference and realleges each and every allegation set forth above, as though fully set forth herein.

154.    The Option Recipient Defendants were unjustly enriched by their receipt and retention of backdated stock option grants and the proceeds they received through exercising backdated stock options, as alleged herein, and it would be unconscionable to allow them to retain the benefits thereof.

155.    To remedy the Option Recipient Defendants' unjust enrichment, the Court should order them to disgorge to the Company all of the backdated stock options they received, including the proceeds of any such stock options that have been exercised, sold, pledged or otherwise monetized.

### COUNT VII
### Against the Option Recipient Defendants
### for Rescission

1    156.    Plaintiff incorporates by reference and realleges each and every allegation set

2    forth above, as though fully set forth herein.

3    157.    As a result of the acts alleged herein, the stock option contracts between the

4    Option Recipient Defendants and the Company entered into during the relevant period were

5    obtained through the Individual Defendants' fraud, deceit and abuse of control.  Further, the

6    backdated Sonic stock options were illegal grants and thus invalid as they were not authorized in

7    accordance with the terms of the Company's shareholder approved stock option plans.

8    158.    All contracts which provide for stock option grants to the Option Recipient

9    Defendants and were entered into during the relevant period should, therefore, be rescinded, with

10   all sums paid under such contracts returned to the Company, and all such executory contracts

11   cancelled and declared void.

12

13

14

15                              **COUNT VIII**
                        **Against The Director Defendants for**
16                   **Violation of Cal. Corp. Code § 600(c)**

17   159.    Plaintiff incorporates by reference and realleges each and every allegation set

18   forth above, as though fully set forth herein.

19   160.    Pursuant to the California Corporations Code, Sonic is required to hold an annual

20   meeting of shareholders at least once every 15 months.

21   161.    Sonic's last annual meeting was held on November 11, 2005, more than 19

22   months ago.

23

24   162.    In violation of California law, the Director Defendants failed to schedule, provide

25   notice of, or hold an annual meeting for 2006, and have yet to hold an annual meeting in 2007.

26   163.    To remedy the Director Defendants' foregoing violation of California law, the

27   Court should issue an Order requiring the Director Defendants within ten (10) days to: (i)

28   CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
     CASE NO. C07-03178 JL

1    schedule an annual meeting of Sonic's shareholders to be held no later than thirty (30) days from

2    the date of the Order; and (ii) provide to Sonic's shareholders notice of the annual meeting in

3    accordance with Sonic's by-laws.

4

            WHEREFORE, Plaintiff demands judgment as follows:

5

6            A.    Issuing an Order requiring the Director Defendants within ten
                   (10) days to: (i) schedule an annual meeting of Sonic's
7                  shareholders to be held no later than thirty (30) days from the
                   date of the Order; and (ii) provide to Sonic's shareholders
8                  notice of the annual meeting in accordance with Sonic's by-
                   laws;

9            B.    Against all of the Individual Defendants and in favor of the
                   Company for the amount of damages sustained by the
10                 Company as a result of the Individual Defendants' misconduct;

11           C.    Ordering the Option Recipient Defendants to disgorge to the
                   Company all of the backdated stock options they received,
12                 including the proceeds of any such stock options that have been
                   exercised, sold, pledged or otherwise monetized, and imposing
13                 a constructive trust thereover;

14           D.    Granting appropriate equitable relief to remedy the Individual
                   Defendants' breaches of fiduciary duties;
15

16           E.    Directing Sonic to take all necessary actions to reform and
                   improve its corporate governance and internal control
17                 procedures to comply with applicable law, including, but not
                   limited to, putting forward for a shareholder vote resolutions
18                 for amendments to the Company's By-Laws or Articles of
                   Incorporation and taking such other action as may be necessary
19                 to place before shareholders for a vote;

20           F.    Awarding to Plaintiff the costs and disbursements of the action,
                   including reasonable attorneys' fees, accountants' and experts'
21                 fees, costs and expenses; and

22           G.    Granting such other and further relief as the Court deems just
                   and proper.
23

                            **JURY TRIAL DEMANDED**
24

25    Plaintiff demands a trial by jury.

26

27
     _____
28   CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
     CASE NO. C07-03178 JL
                                    -47-

1

2   Dated: July 10, 2007                    Respectfully submitted,

3                                           SCHIFFRIN BARROWAY TOPAZ & KESSLER, LLP

4

5                                           Alan R. Plutzik, Of Counsel (Bar No. 077785)

6                                           Robert M. Bramson, Of Counsel (Bar No. 102006)
                                            L. Timothy Fisher, Of Counsel (Bar No. 191626)
7                                           2125 Oak Grove Road, Suite 120
                                            Walnut Creek, CA 94598
8                                           Telephone: (925) 945-0770
                                            Facsimile: (925) 945-8792
9                                                   -and
                                            Eric L. Zagar
10                                          Nichole Browning
                                            J. Daniel Albert
11                                          280 King of Prussia Road
                                            Radnor, PA 19087
12                                          Telephone: (610) 667-7706
                                            Facsimile: (610) 667-7056
13

14                                          *Attorneys for Plaintiffs*

15

16

17

18

19

20

21

22

23

24

25

26

27

28  CORRECTED SHAREHOLDER DERIVATIVE COMPLAINT
    CASE NO. C07-03178 JL
                                            -48-